In the Matter of LAWRENCE R. BLAKE, as Holder of 25% of All Outstanding Shares Entitled to Vote in an Election of Shareholders of Blake Agency, Inc., Appellant-Respondent, v BLAKE AGENCY, INC., Respondent-Appellant.

Second Department, February 25, 1985

140

### APPEARANCES OF COUNSEL

*Wimpheimer & Sherman* (*Steven Wimpheimer* and *Eugene J. Cunningham* of counsel), for appellant-respondent.

*Broderick, Broderick & Redmond* (*Peter E. Redmond* and *Patrick F. Broderick* of counsel), for respondent-appellant.

### OPINION OF THE COURT

THOMPSON, J.

These appeals concern the valuation of a minority interest in the shares of a closely held corporation, where the minority shareholder has commenced a special proceeding pursuant to Business Corporation Law § 1104-a to dissolve the corporation, and the corporation has elected to buy out the minority shareholder pursuant to Business Corporation Law § 1118. Specifically, we are called upon in this case to determine whether Special Term correctly valued petitioner Lawrence R. Blake's 25% interest in the common stock of Blake Agency, Inc., whether Special Term erred in failing to award interest on the "fair value" of petitioner's shares from the date immediately preceding the filing of the petition for dissolution to the date of payment, pursuant to Business Corporation Law § 1118 (b), and whether Special Term erred in failing to impose all of petitioner's expenses in litigating this proceeding on the respondent-appellant corporation.

#### THE FACTS

Blake Agency, Inc., is a storefront insurance brokerage firm, located in Queens County, which specializes in property and casualty insurance. The agency was incorporated in 1954 by William Blake, Sr. Upon his death in 1968, four of his sons each received a 25% share of the stock in the corporation. In 1971, William Blake, one of the sons of William Blake, Sr., bought his brother Richard Blake's 25% share of the corporation, thereby acquiring effective control of the company. The corporation has never declared or paid any dividends.

Petitioner Lawrence R. Blake apparently had various disagreements with his brother William Blake with regard to corporate operations. Petitioner believed he had been "frozen out" of the corporation's affairs, as evidenced by the fact that he was never consulted before corporate decisions were made and the fact that he was never paid any dividends. On August 4, 1981, he filed a petition pursuant to Business Corporation Law § 1104-a for the judicial dissolution of Blake Agency, Inc. On October 30, 1981, the corporation elected to purchase Lawrence R. Blake's shares in the corporation for their "fair value", pursuant to Business Corporation Law § 1118 (a). By order dated November 19, 1981 (Graci, J.), the dissolution proceeding was stayed pursuant to Business Corporation Law § 1118 (b), pending negotiations undertaken by the parties in an attempt to agree on the "fair value" of the minority shares. On April 5, 1982, the parties stipulated that they were unable to agree on the value of petitioner's shares. Special Term (Graci, J.), on or about April 8, 1982, appointed Samuel S. Tripp, Esq., as a referee to help determine the question of the "fair value" of petitioner's shares in the corporation. The "fair value" of the shares had to be determined as of August 3, 1981, the day immediately preceding the filing of the petition and order to show cause (Business Corporation Law § 1118 [b]).

After hearing the testimony of various witnesses, including four experts, the referee determined the "fair value" of petitioner's shares to be $64,834. The referee's calculations commenced by multiplying adjusted gross revenue from insurance commissions by a factor of one (a capitalization rate of 100%), in order to determine the value of the corporation's goodwill. Gross commission revenue was determined to be $254,210. This amount was then reduced by subtracting "Subproducer Revenues" of $32,744 and "Contingent Income" of $9,872, leaving a balance of $211,594.* The referee divided the $211,594 by four to determine petitioner's 25% share of the goodwill of the corporation, resulting in a figure of $52,898. He then applied a discount of 40% to this figure because petitioner's shares represented a minority interest in the corporation and because they were not readily marketable. After application of this discount, petitioner's share of the intangible value of the corporation (goodwill) was determined to have a fair value of $31,739. The referee also found

---

* "Subproducer Revenue" constitutes commissions earned from business referred to the corporation from other insurance agents who apparently had an oral agreement with the agency. "Contingent Income" represents funds received from insurance companies if the loss ratios on the policies handled by the agency fall below a certain average.

that petitioner's share of the corporation's net tangible value was $33,095, representing 25% of the corporation's assets ($321,443.03) less its current liabilities ($189,060.25). He did not apply a discount to net tangible value. Combining the intangible value and the net tangible value, the referee concluded that the fair value of petitioner's shares in the corporation as of August 3, 1981 was $64,834. He found that the investment value should be considered in the determination of fair value in this case, and that neither "net asset value" nor "market value" should be considered. Additionally, the referee found that William Blake's annual compensation of approximately $84,000 was not excessive.

The referee's valuation of petitioner's 25% interest in Blake Agency, Inc., can be summarized as follows:

### Intangible Value

| | |
|---|---:|
| Gross Commission Revenue for the period ended June 30, 1981 | $ 254,210 |
| Less: "Subproducer Revenues" | (32,744) |
| Less: "Contingent Income" | (9,872) |
| Adjusted Gross Commission Revenue | $ 211,594 |
| Petitioner's 25% share | $ 52,898 |
| | |
| Less: 40% combined minority interest and lack of marketability discount | (21,159) |
| Petitioner's share of goodwill | $ 31,739 |

### Net Tangible Value

| | |
|---|---:|
| Assets | $ 321,443 |
| Less: Current Liabilities | (189,060) |
| Net Tangible Value | $ 132,383 |
| Petitioner's 25% share | $ 33,095 |
| Intangible Value | $ 31,739 |
| Net Tangible Value | 33,095 |
| Fair Value | $ 64,834. |

By judgment dated May 11, 1983, Special Term adjudged the "fair value" of petitioner's shares in Blake Agency, Inc., to be

$64,834 as of August 3, 1981. The judgment failed to grant interest to petitioner on said amount from August 3, 1981 to the date of payment, and failed to impose petitioner's costs in litigating the proceeding (costs, disbursements, and experts' and attorneys' fees) on the corporation.

### CONTENTIONS OF THE PARTIES

Petitioner contends (1) the referee erred in his determination of goodwill by applying a multiplier of only one to gross commission revenue instead of a multiplier of at least two, as suggested by his expert, Herbert Lapidus; (2) the referee erred in deducting "Subproducer Revenue" and "Contingent Income" from gross commission revenue; (3) the referee should not have discounted petitioner's interest in the corporation's goodwill; (4) William Blake's compensation was excessive, and a portion of the compensation should be added to the corporation's net tangible value; and (5) Special Term erred in not awarding petitioner interest on the "fair value" of his shares and in not imposing all of petitioner's costs, disbursements and expenses incurred in litigating the proceeding on the corporation.

Respondent-appellant corporation argues (1) the referee failed to recognize the corporation's need for working capital in determining the fair value of petitioner's shares; (2) the referee should have discounted petitioner's share of net tangible value, as well as discounting goodwill; and (3) the referee's calculation of goodwill was excessive.

### THE STATUTORY FRAMEWORK

Business Corporation Law § 1104-a and § 1118 were enacted in 1979 (L 1979, ch 217) for the specific purpose of enabling minority shareholders of closely held corporations to obtain relief, when they found themselves in a situation of being denied participation in or being "frozen out" of corporate management (*see,* O'Neal, "Squeeze-Outs" of Minority Shareholders [Callaghan 1975]; *see also, Matter of Kemp & Beatley [Gardstein],* 64 NY2d 63) and being refused employment by the corporation and/or participation in dividends (*see,* 1979 NY Legis Ann, at 143-44). The statutes were enacted to afford a minority shareholder the right to bring a proceeding to dissolve the corporation and to distribute its assets among the shareholders. Section 1118 counterbalances section 1104-a by affording the corporation the option of electing to purchase the minority's shares, thereby avoiding dissolution (*see, e.g., Matter of Gift Pax,* 123 Misc 2d 830, *affd sub nom. Matter of Fleischer,* 107 AD2d 97). The statutes provide:

"§ 1104-a. Petition for judicial dissolution under special circumstances

"(a) The holders of twenty percent or more of all outstanding shares of a corporation, other than a corporation registered as an investment company under an act of congress entitled 'Investment Company Act of 1940', no shares of which are listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national or an affiliated securities association, who are entitled to vote in an election of directors may present a petition of dissolution on one or more of the following grounds:

"(1) The directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders;

"(2) The property or assets of the corporation are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation.

"(b) The court, in determining whether to proceed with involuntary dissolution pursuant to this section, shall take into account:

"(1) Whether liquidation of the corporation is the only feasible means whereby the petitioners may reasonably expect to obtain a fair return on their investment; and

"(2) Whether liquidation of the corporation is reasonably necessary for the protection of the rights and interests of any substantial number of shareholders or of the petitioners."

"§ 1118. Purchase of petitioner's shares; valuation

"(a) In any proceeding brought pursuant to section eleven hundred four-a of this chapter, any other shareholder or shareholders or the corporation may, at any time within ninety days after the filing of such petition or at such later time as the court in its discretion may allow, elect to purchase the shares owned by the petitioners at their fair value and upon such terms and conditions as may be approved by the court.

"(b) If one or more shareholders or the corporation elect to purchase the shares owned by the petitioner but are unable to agree with the petitioner upon the fair value of such shares, the court, upon the application of such prospective purchaser or purchasers, shall stay the proceedings brought pursuant to section 1104-a of this chapter to determine the fair value of the petitioner's shares as of the day prior to the date on which such petition was filed, exclusive of any element of value arising from such filing."

DETERMINING "FAIR VALUE"

A court's obligation to determine the "fair value" of the petitioner's shares in a closely held corporation presents a difficult problem. The statute does not define the term "fair value", and it fails to provide any criteria for determining "fair value". In making the necessary determination, courts should generally look for guidance to the criteria set forth by the cases interpreting Business Corporation Law § 623, the appraisal rights statute. The factors to be considered are, *inter alia,* market value, investment value, and net asset value *(see, Matter of Endicott Johnson Corp. v Bade,* 37 NY2d 585, 587; *Matter of Fulton,* 257 NY 487; *see also,* 12B [rev vol] Fletcher, Cyclopedia of Private Corporations § 5906.12, at 386 [permanent ed]). The weight to be accorded each factor depends upon the circumstances of the particular case *(see, Matter of Endicott Johnson Corp. v Bade, supra; Matter of Behrens,* 61 NYS2d 179, *affd sub nom. Matter of Standard Coated Prods.,* 271 App Div 1007; *Matter of Marcus* [*Macy & Co.*], 273 App Div 725, 729-731, *affd* 303 NY 711). The value of the corporation should be determined on the basis of what a willing purchaser, in an arm's length transaction, would offer for the corporation as an operating business, rather than as a business in the process of liquidation *(see, e.g., Matter of Fulton, supra; Matter of Behrens, supra).*

Within the context of a closely held corporation, market value is usually of little or no significance because the shares of stock are not traded on any public market. Moreover, other than certain bona fide offers to purchase all of the outstanding stock of a corporation (i.e., through a merger or acquisition), a sale of the stock of a closely held corporation usually does not qualify as an arm's length transaction because the sale usually involves corporate officers, employees or family members *(see, e.g.,* Haynsworth, *Valuation of Business Interests,* 33 Mercer L Rev 457, 470). Net asset value is generally the standard applicable in evaluating manufacturing corporations or real estate and investment holding companies. With a corporation like the one in issue herein, investment value will usually be the primary criterion upon which "fair value" is based.

In addition, the Internal Revenue Service has developed the following factors to be considered in determining the fair market value of closely held corporate stock for estate and gift tax purposes *(see,* Rev Rul 59-60, 1959-1 CB 237, at 238-39):

"(a) The nature of the business and the history of the enterprise from its inception.

"(b) The economic outlook in general and the condition of the specific industry in particular.

"(c) The book value of the stock and the financial condition of the business.

"(d) The earning capacity of the company.

"(e) The dividend paying capacity.

"(f) Whether or not the enterprise has goodwill or other intangible assets.

"(g) Sales of the stock and the size of the block of stock to be valued.

"(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter."

Investment value is usually a function of the earning power of the corporation. Thus, acceptable methods of determining investment value include (1) a "discounted income approach", by which either average earnings of the corporation measured over a number of years, or a weighted average of corporate earnings (giving greater weight to corporate earnings of the most recent years) is capitalized at a predetermined percentage, and using the capitalization rate, a multiplier is developed and that multiplier is then applied to earnings; (2) capitalization of dividends, if the corporation has a history of payment of dividends; or (3) a "comparative appraisal" approach, which utilizes a comparison with the price-to-earnings ratios of publicly traded stocks in similar industries and financial situations of the closely held corporation (*see generally,* Haynsworth, *Valuation of Business Interests,* 33 Mercer L Rev 457; Schreier and Joy, *Judicial Valuation of "Close" Corporation Stock: Alice in Wonderland Revisited,* 31 Okla L Rev 853; 12B [rev vol] Fletcher, Cyclopedia of Private Corporations §§ 5906.12-5906.15, at 386-404 [permanent ed]).

This list of methods of valuation is not all-inclusive. In various cases, courts may need to examine the compensation paid to a principal shareholder (*see, e.g., In re Delinko [Sunshine Temporary Off. Personnel],* NYLJ, Oct. 7, 1982, p 6, col 5 [Alexander, J.]), the corporation's cash flow (*see, Matter of Taines v Barry One Hour Photo Process,* 123 Misc 2d 529), or some other measure of corporate earnings. Furthermore, if goodwill is an element in evaluating the corporation, the court will necessarily have to make a determination regarding its value. One generally accepted method of determining the value of goodwill is by

capitalizing the corporation's net earnings after making a deduction for earnings attributable to net tangible assets (*see,* Rev Rul 68-609, 1968-2 CB 327; *see also,* Prentice-Hall, Federal Taxes, para 120,314.1 [b], at 120,220-120,222 [1984]).

THE "FAIR VALUE" OF PETITIONER'S SHARES
AND THE NATURE OF HIS AWARD

A

■ Contrary to petitioner's contention, we find that the referee was justified in applying a multiplier of only one to gross commission revenue in determining the value of the corporation's goodwill. The referee credited the testimony of the corporation's expert, Kenneth Pollock, that the insurance industry was "soft" due to direct billing of premiums by insurance companies, and that the value of the goodwill of an insurance agency should thus be measured by applying a multiplier of one to gross commission revenue. The insurance industry, according to the testimony, had become "soft" because agencies had to remit premiums to the insurance companies on an "account rendered basis" (within 45 days of receipt). This situation, coupled with the insurance companies' policy of directly billing policyholders for premiums in order to take advantage of higher interest rates, greatly reduced the insurance agencies' ability to invest premiums in high-interest certificates of deposit. We decline to disturb the referee's finding because he properly considered the characteristics of the industry as a whole in making his determination.

Petitioner's reliance on *Donehoo v United States* (21 AFTR2d 1700) is misplaced. Although the court in that case applied a multiplier of 1.5 to the gross commission revenue of an insurance agency, that case involved the valuation of a Pittsburgh, Pennsylvania, insurance agency in 1962. Furthermore, the multiplier of 1.5 was expressly agreed to by the parties.

The referee was also justified in deducting "Contingent Income" from gross commission revenue. The uncontroverted evidence is that such income is dependent on the agency's policies generating less than average loss ratios. In any particular year there may be no "Contingent Income" whatsoever. Thus, the referee's deduction of this item was proper.

■ Petitioner, however, is entitled to a percentage of the "Subproducer Revenue" earned by the corporation. Although the record shows that the subproducing insurance agents associated with Blake Agency, Inc., had no contractual or family relationship with the agency and were free to terminate their

association with the agency at will, the subproducers did generate 20% of the agency's gross commission revenue, and all of the corporation's five subproducers have been associated with the corporation for at least three years. Therefore, in calculating "fair value" we have added 50% of "Subproducer Revenue", to wit, $16,372, to gross commission revenue.

B

■ With regard to the discount applied by the referee and approved by Special Term, we believe that that discount should be reduced from 40% to 25%. Said discount should only reflect the lack of marketability of petitioner's shares in the closely held corporation. No discount should be applied simply because the interest to be valued represents a minority interest in the corporation.

Business Corporation Law § 1104-a was enacted for the protection of minority shareholders, and the corporation should therefore not receive a windfall in the form of a discount because it elected to purchase the minority interest pursuant to Business Corporation Law § 1118. Thus, a minority interest in closely held corporate stock should not be discounted solely because it is a minority interest (*see, Brown v Allied Corrugated Box Co.,* 91 Cal App 3d 477, 154 Cal Rptr 170; *Woodward v Quigley,* 257 Iowa 1077, 133 NW2d 38; *but see, Perlman v Permonite Mfg. Co.,* 568 F Supp 222, 230-232, *affd* 734 F2d 1283; *Moore v New Ammest,* 6 Kan App 2d 461, 474-475, 630 P2d 167, 177).

However, a discount recognizing the lack of marketability of the shares of Blake Agency, Inc., is appropriate, and, under the circumstances of this case, the amount of the discount should be 25%. A discount for lack of marketability is properly factored into the equation because the shares of a closely held corporation cannot be readily sold on a public market. Such a discount bears no relation to the fact that the petitioner's shares in the corporation represent a minority interest (*see, e.g.,* Haynsworth, *Valuation of Business Interests,* 33 Mercer L Rev 457, 489-90; Lyons & Whitman, *Valuing Closely Held Corporations and Publicly Traded Securities with Limited Marketability: Approaches to Allowable Discounts from Gross Values,* 33 Bus Law 2213; *cf. Ford v Courier-Journal Job Print. Co.,* 639 SW2d 553 [Ky App]).

Applying the 25% discount of petitioner's shares and adding back 50% of subproducer revenue increases, the "fair value" of petitioner's shares is as follows:

| | |
|---|---|
| Adjusted Gross Commission Revenue | $ 211,594.00 |
| Add: 50% of "Subproducer Revenues" | 16,372.00 |
| Total | $ 227,966.00 |
| | |
| Petitioner's Share of Goodwill | $ 56,991.50 |
| Less: 25% Discount | (14,247.88) |
| Discounted Share of Goodwill | 42,743.62 |
| Petitioner's Share, Net Tangible Value | 33,095.00 |
| Fair Value | $ 75,838.62. |

C

■ The referee was fully justified in finding that William Blake's compensation was not excessive in light of his abilities and duties (*see, Gallin v National City Bank,* 152 Misc 679). Petitioner's expert opined that an executive who generated $850,000 per year in business should be paid a base salary of $25,000 plus a 30% bonus for additional new business. The corporation's expert testified that the Blake Agency did over $1,800,000 in business per year, and that this would usually require two executives earning a total of $82,000 in salaries and bonuses, not including pension contributions and perquisites. Thus, the referee was fully justified in finding that William Blake's compensation and benefits of $84,000 were not excessive.

D

■ However, Special Term erred by not awarding interest on its award of the "fair value" of petitioner's shares. In proceedings pursuant to Business Corporation Law § 1104-a and § 1118, the court is not precluded from making such orders as justice requires (*see, Matter of Fleischer [Gift Pax],* 79 AD2d 636). Although the aforementioned statutes, unlike the appraisal rights statute (Business Corporation Law § 623 [h] [6]) do not specifically provide for the payment of interest on the fair value of the shares, justice requires that in cases arising under Business Corporation Law § 1104-a and § 1118, interest be paid. The appropriate rate is to be determined by the court, and the interest should run from the date prior to the filing of the petition until the date of payment, unless a determination is made that petitioner has acted in bad faith. Special Term should have awarded interest on the "fair value" of petitioner's shares

in the corporation, and, accordingly, we award petitioner interest at the statutory rate of 9% per annum (CPLR 5004) from August 3, 1981 until the date of payment.

■ We decline to impose all of petitioner's costs, expenses, and attorneys' and experts' fees on the respondent-appellant corporation. Such awards are discretionary with the court (*see, Matter of Fleischer* [*Gift Pax*], 79 AD2d 636, *supra*). Unlike an appraisal proceeding, which may be commenced by one shareholder dissenting from a merger or a sale of substantially all of the corporation's assets (Business Corporation Law § 623 [a]), 20% of the shareholders of a closely held corporation are required to invoke the provisions of Business Corporation Law § 1104-a and § 1118. The chilling effect that the costs of an appraisal proceeding under Business Corporation Law § 623 may have on an individual shareholder will therefore not be as overwhelming within the context of dissolution proceedings brought pursuant to Business Corporation Law § 1104-a and § 1118 (*cf. Matter of Shore* [*Parklane Hosiery*], 67 AD2d 526, 532, 533, *lv dismissed* 48 NY2d 634). Although Business Corporation Law § 1104-a and § 1118 make no provision for the imposition of costs, expenses and fees, we believe that it is equitable in this case to apportion court costs and disbursements (including the referee's fee of $10,000) pursuant to CPLR 8201 and 8301, one fourth against petitioner and three fourths against the corporation, based upon the respective percentages of shares owned by petitioner and the other shareholders of the corporation (*see, Matter of Gift Pax,* 123 Misc 2d 830, 837-838, *affd sub nom. Matter of Fleischer,* 107 AD2d 97, *supra*). Therefore, the judgment should be modified accordingly. Each party should pay its own attorneys' and experts' fees.

E

■ Turning to the issues raised in the corporation's cross appeal, the referee was justified in not discounting petitioner's share of net tangible assets, despite the argument that this approach fails to account for the working capital needs of the corporation. Under the circumstances of this particular case it was unnecessary to apply a discount to net tangible value (*cf.* Haynsworth, *Valuation of Business Interests,* 33 Mercer L Rev 457, 488) because the corporation admittedly has never paid any dividends, and because the corporation's June 30, 1981 balance sheet shows that it has more than $70,000 cash in savings accounts and over $48,000 in marketable securities. These assets will leave the corporation with sufficient working capital, even after it has paid petitioner the fair value of his shares.

Finally, contrary to the corporation's contention, the referee's determination that its goodwill amounted to $211,594 was not unwarranted in light of the corporate assets of more than $320,000 and the combined net earnings to the corporation (approximately $8,000) and compensation to William Blake ($84,000) of $92,000 (*cf. von Au v Magenheimer,* 115 App Div 84).

### CONCLUSION

The judgment should be modified, on the law and the facts, by (1) increasing the amount ordered and adjudged to be the "fair value" of the 50 shares of capital stock owned by petitioner Lawrence R. Blake from $64,834 to $75,838.62; (2) awarding petitioner interest of 9% per annum on said sum from August 3, 1981, to the date of payment; and (3) directing that one fourth of the court costs and disbursements (including the referee's fee) pursuant to CPLR 8201 and 8301 is to be paid by petitioner and three fourths of those court costs and disbursements are to be paid by respondent-appellant Blake Agency, Inc. As so modified, the judgment should be affirmed insofar as appealed from, without costs or disbursements, and the matter remitted to Special Term for entry of an appropriate amended judgment.

MOLLEN, P. J., TITONE and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, Queens County, dated May 11, 1983, modified, on the law and the facts, by (1) increasing the amount ordered and adjudged to be the "fair value" of the 50 shares of capital stock owned by petitioner Lawrence R. Blake from $64,834 to $75,838.62; (2) awarding petitioner interest of 9% per annum on said sum from August 3, 1981 to the date of payment; and (3) directing that one fourth of the court costs and disbursements (including the referee's fee of $10,000) pursuant to CPLR 8201 and 8301 is to be paid by petitioner and three fourths of those court costs and disbursements are to be paid by respondent-appellant Blake Agency, Inc. As so modified, judgment affirmed insofar as appealed from, without costs or disbursements, and matter remitted to Special Term for entry of an appropriate amended judgment.