OPINION OF THE COURT
Stephen G. Crane, J.
Respondent in this corporate dissolution proceeding moves to restore to the calendar its motion to reject entirely the Report of Special Referee Frank B. Lewis dated March 25, 1994 (hereinafter The Report) and to make new findings without taking additional testimony. Petitioner cross-moves to hold the motion in abeyance pending decision of her Appellate Division motion for reargument or leave to appeal or, alternatively, to confirm The Report of the Special Referee and enter judgment thereon.
The first branch of the cross motion is denied as moot. The Appellate Division denied petitioner’s motion for reargument or leave to appeal in an order dated September 19, 1995.
By order dated September 29, 1994, this court held in abeyance pending an independent appraisal the motions of petitioner and respondent, respectively, to confirm and reject The Report recommending a value of petitioner’s shares of $305,900. These motions are restored to the calendar through the vehicle of the motion and cross motion currently before the court.
*93 Following this court’s order[1] holding in abeyance the resolution of The Report, petitioner appealed on the ground that the reference was to hear and determine, that this court had no power to appoint an independent appraiser, and that the Referee’s finding of facts and valuation was binding and had to be confirmed. By order and decision dated May 30, 1995, the Appellate Division affirmed. (Matter of Cohen [Four Way Features], 215 AD2d 341 [1st Dept 1995].) Citing CPLR 4403, that Court found that this court could confirm or reject in whole or in part and could make new findings without taking additional testimony. Furthermore, it upheld the authority of this court to appoint a third expert. The panel did express dictum[2] to the effect that the Special Referee’s evaluation was reasonable under the circumstances. (Matter of Cohen [Four Way Features], 215 AD2d 341, supra.)
Now that the court is comforted by the affirmation of five Justices at the Appellate Division that it is authorized to consider the fair value of the petitioner’s shares under Business Corporation Law § 1118 on the merits and to analyze the validity of the findings of the Special Referee, this decision will consider and fix this "fair value”.

Burden of Proof

Special Referee Frank Lewis initially concerned himself with the burden of proof in an appraisal under Business Corporation Law § 1118. He said in The Report (at 2): "Unlike most cases heard by courts the law does not clearly establish which party has the burden of proof and what is 'ground zero’, the presumptive point before evidence is presented * * * There is no controlling case law on the subject.”
An answer to the question Referee Lewis has posed, I think, will focus more clearly the appropriate analysis of "fair value” of petitioner’s shares, particularly in view of the history of this proceeding and the report of the independent appraiser that the court has appointed. No New York authority has ascribed the burden of proof nor defined its level in the context of fixing *94 "fair value” under Business Corporation Law § 1118 or § 623 (h). We have learned that "there is no difference in analysis between stock fair value determinations under Business Corporation Law § 623, and fair value determinations under Business Corporation Law § 1118.” (Matter of Friedman v Beway Realty Corp., 87 NY2d 161, 168.) Yet, that recent decision does not address the burden of proof question. Consequently, the court looks out of State.
Elsewhere, the burden has been placed variously on the corporation in a dissenting shareholder situation (Multitex Corp. v Dickinson, 683 F2d 1325 [11th Cir 1982]; Atlantic States Constr. v Beavers, 169 Ga App 584, 314 SE2d 245 [1984]) and on the petitioner in an appraisal proceeding (Dofflemyer v Hall Print. Co., 1980 WL 6414 [Del Ch], affd 432 A2d 1198 [1981]; Campbell v Caravel Academy, 1988 WL 63492 [Del Ch], affd 553 A2d 638 [1988]). In Oregon one court observed that the burden of proof is not necessarily on the dissenters; but they are entitled to fair value even without putting forth any evidence in an appraisal proceeding. (Chrome Data Sys. v Stringer, 109 Ore App 513, 517, 820 P2d 831, 833, n 2 [1991].) This position is close to one articulated by the Court of Appeals of Ohio, Hancock County, in 1986: "[T]he ultimate issue was fair cash value and neither the statute, nor practicality, placed the burden of proof on one party rather than another.” (Price v Marathon Oil Co., 1986 WL 807, at 3 [Ohio App].) In Ohio the primary objective is to provide all parties an opportunity to be heard on the question of fair value and, then, for the court "based on all of the relevant evidence without consideration of burden of proof, to make a finding as to fair cash value.” (1986 WL 807, at 4, supra.) The most persuasive explanation for what can be called the "no burden” position is found in the Court of Chancery, New Castle County, Delaware. As in the New York scheme, it is the court that has the obligation to establish fair value in an appraisal. In this context, there is no occasion to approach the problem by analyzing who has the burden of proof and finding against that party if she or it fails to carry this burden.. "In an ordinary litigation, the matter might be resolved by applying traditional burden of proof rules. If the Court had found that neither side had adequately established a * * *.value * * * it could rule against the party having the burden of proof. However, that approach is not permissible in a [statutory] appraisal. The statute directs that the Court 'shall appraise’ the fair value of the dissenting shareholders’ shares.” (Cavalier Oil Corp. v Harnett, 1988 WL 15816, at 20, affd 564 *95 A2d 1137 [1989].) The same court, somewhat obversely, applied this concept by suggesting that both sides bore the burden to prove their respective valuation position by a preponderance of the evidence. (Pinson v Campbell-Taggart, Inc., 1989 WL 17438, at 6-7.)
However analyzed, the court at bar has a responsibility to "determine the fair value of petitioner’s shares as of the day prior to the date on which such petition was filed.” (Business Corporation Law § 1118 [b].) This formulation defies application of a burden-of-proof approach. That each party presented their views of the value of petitioner’s shares through expert testimony does not require or even invite the court to measure value using or rejecting either or both opinions of value. Neither does it exonerate the court from formulating a value, as Referee Lewis attempted, after rejecting both experts’ opinions. In fact, this was the very reason the court appointed an independent expert — to assist it in its own task of determining fair value.

Credibility of Experts

Deference is owed to the credibility findings of the Special Referee who heard the witnesses and was in the best position to determine the factual issues. (Kardanis v Velis, 90 AD2d 727; Matter of Holy Spirit Assn. for Unification of World Christianity v Tax Commn., 81 AD2d 64, 71, revd on other grounds 55 NY2d 512.) The court, however, may disturb these findings to the extent not substantiated by the record (supra). But, "the final decision lies with the judge, who can confirm or reject the [recommendations and findings] in whole or in part, and, if so disposed, make different findings.” (Siegel, NY Prac § 381, at 577.)
Respondent’s expert, Ronald J. Klein, a CPA, testified that the fair value as of December 31, 1991, the end of the year preceding the valuation date, was zero. Petitioner’s expert, Kirk D’Amico, a lawyer, opined that the fair market value was $1.5 million, a level at which it could be sold on the open market.[3] While the Referee found each fully qualified (a finding on which reasonable minds might differ), he rejected as "patently incredible and unworthy even of consideration” the ultimate conclusion reached by Mr. Klein. By comparison, and not necessarily by contrast, Referee Lewis found Mr. D’Amico’s valuation *96 "highly exaggerated but nevertheless * * * worthy of consideration as a starting point.” (The Report, at 3.)
The Special Referee was particularly caught up with the notion that the corporation had to be of some value because the "power of [a] controlling shareholder to provide oneself with a salary is a desirable asset.” (Id., at 6.) Yet, Referee Lewis expressly disclaimed a finding that the salary of respondent’s Chief Executive Officer, Seymour Wishman, was excessive; and petitioner clearly excluded from this appraisal proceeding any claim that Mr. Wishman’s compensation was unreasonable.[4] While a "cushy” salary for the controlling stockholder of a close corporation calls for enhanced scrutiny in an appraisal of the fair value of the shares of that corporation, it is a circumstance that does not automatically bestow value for the corporation’s shares. When one overcomes the emotional impact of this circumstance and recognizes, as did Referee Lewis, that the salary is reasonable, there is every reason to depersonalize the recipient of this compensation and to analyze the value of the corporation from the standpoint that comparable compensation would have to be paid to whoever performs the same services. After all, it is these services that permit the corporation to generate gross receipts. Therefore, the fact that the controlling shareholder is receiving salary for his valuable services does not mean that the company is making a profit. Rejection of Mr. Klein’s valuation as incredible for that reason was error.
A second basis for Referee Lewis to reject the valuation of respondent’s expert was a "contract” dated December 1, 1988, listing the corporation for sale or soliciting investments for $1.25 million. Though the Referee recognized that no sale took place pursuant to that brokerage agreement, he opined that "this item of evidence discredits respondent’s position that it has no value.” (The Report, at 7.) Since the Referee failed to appreciate the dual function of this agreement — an unconsummated offer for sale or investment — the court cannot agree that it is a worthy reason to reject Mr. Klein’s valuation as "incredible”.
Finally, without denigrating Mr. D’Amico’s experiences in film-related businesses, his background is lacking in evaluating *97 close corporations. Though the Referee qualified him as an expert, his credentials were limited to valuing physical inventories consisting of films in a few film libraries. His valuation experiences were developed in his own company in the area of corporate finance. He did not define what he meant by this except to say that it was "evaluating companies from the perspective of raising finance for their purchase or for their sale.” (Tr., at 655, 541; see generally, 523-546.) For this reason and because of defects in his applying well-settled rules of valuing corporations, the Special Referee erred in crediting Mr. D’Amico’s opinion albeit only as a "starting point”.

Valuation

In assessing the value of dissenting shares under Business Corporation Law § 623 or the fair value under section 1118 of shares to be acquired from a petitioner for dissolution under section 1104-a, the court may consult any or all of three elements: net asset value, investment value and market value. Fair value is not necessarily tied to market value. Investment value can be "ascertained through a capitalization of earnings (taking into account the unmarketability of the corporate stock).” (Matter of Friedman v Beway Realty Corp., 87 NY2d 161, supra.)
Indeed, this approved approach to investment value can be viewed in the opinion of the respondent’s expert, Mr. Klein. He used a capitalization of earnings method via the formula approach that viewed net earnings in excess of reasonable compensation and via the discounted cash flow method which also recognized reasonable compensation. Petitioner’s own expert acknowledged that capitalization of excess earnings was a valid method of appraisal. (Tr., at 664.) This approach, including a valuation of the projected earnings from distribution of the films that respondent had the right to distribute, was likewise used by Raymond T. Sloane of Margolin, Winer & Evens LLP, the court’s independent expert (Sloane).
What Mr. D’Amico, petitioner’s expert, fell into error about was his failure to appreciate the difference between the films that physically existed in the libraries that he had evaluated in the past and the distribution rights sans the physical properties in the "libraries” of respondent and its subsidiaries. D’Amico and Sloane both valued these "libraries”. But, D’Amico took no account of the royalties required to generate income for the respondent from prosecuting the rights to distribute the films in its cornucopia. (Tr., at 784.) This oversight *98 fundamentally flaws D’Amico’s valuation of the "library” of the respondent and his ultimate conclusion of the value of the corporation. This oversight had a subparagraph in the valuation of the library of the subsidiary First Run/Icarus Films: D’Amico attributed full value to respondent; yet, respondent owned only 55% of the stock of the subsidiary! Wherever, if at all, D’Amico took into account overhead and other expense-side features of running a business was concealed from the Special Referee and from this court.
Yet, the Referee took D’Amico’s speculation-cum-opinion as a "starting point” to arrive at his own value for petitioner’s shares. Here we proceed Alice-in-Wonderland-like into the value Referee Lewis recommended that the court adopt: $950,000 for the corporation; $305,900 for petitioner’s 32.2% interest. How did he arrive at these figures? He said that based on gross revenues in 1991 of $1,264,964, "the corporation’s own estimation of its value in 1988 in the brokerage contract, the salary paid to its Chief Executive Officer of $120,000 /sic — see, n 4] annually, and the corporation’s long record of success” Referee Lewis assigned an average yearly earning capacity of $190,000. By applying a multiplier of five (which he penned into his typewritten report) he derived the figures set forth above. He never revealed where he found the facts to apply a multiplier of five. His figure of $190,000 as the average yearly earning capacity of the respondent is contradicted by the unassailed earnings figures for the corporation covering the five years immediately preceding the valuation date. In fact, the average outcome of these years, including 1991 when the corporation grossed $1,264,964, which so impressed the Special Referee, was $5,312 per year. The corporation suffered net losses in three of the prior five years including 1991 when the loss was $30,628. How such a corporation could be worth $950,000 as of the valuation date is unfathomable.
The court’s independent appraiser opined that the value of petitioner’s shares was $19,800 as of May 23, 1992. Mr. Sloane analyzed the net asset value and the investment value of the corporate respondent. (Sloane report, at 6-7.) Sloane was conservative in many respects that would enhance the ultimate result for the petitioner. For example, Sloane stated at pages 7-8 of his report that advances to producers may have been overstated but "we have not reduced this asset for any unreimburseable advances, though it is possible that certain films may not generate enough future revenue to recoup such advances”. For another example, in applying a marketability *99 discount (see, Matter of Friedman v Beway Realty Corp., supra; Matter of Seagroatt Floral Co. [Riccardi], 78 NY2d 439; Matter of Blake v Blake Agency, 107 AD2d 139, 149, Iv denied 65 NY2d 609), Sloane reduced value by only 25% though studies on the subject suggest a discount of between 35% and 50%. (Sloane report, at 16.) Of course, Sloane obeyed New York authorities in avoiding a discount for petitioner’s minority holdings. (Id., at 15-16.)
Basically, Sloane’s valuation more nearly approximates the fair value of petitioner’s shares as of May 23, 1992, the Business Corporation Law § 1118 valuation date. Sloane’s detailed report sets forth his methodology, which was not limited to a single approach, explains an intelligent, if not brilliant, method of valuing respondent’s rights to distribute the films on its lists, and avoids the pitfalls that were a hallmark of D’Amico’s ostrich-like valuation. Especially significant was Sloane’s realistic treatment of the fact that respondent, like any other business, incurs expenses in order to generate its revenues— something that D’Amico and the Special Referee seem to have overlooked in large measure.

Petitioner’s Opposition

Petitioner has been strangely muted in defending her expert’s opinion of fair value and the Special Referee’s concoction or in attacking the Sloane valuation. All she does is repeat the arguments against appointment of the court’s appraiser which were rejected by the Appellate Division. She does suggest that somehow she will be deprived of a right to cross-examine if the court merely accepts Sloane’s valuation. Yet, though neither side has a burden of proof, she has had every opportunity to attack Sloane’s report with her own expert affidavit or even with her counsel’s affirmation pointing to errors in Sloane’s report. Her repose in this regard is eloquent recognition of the unassailability of Sloane’s valuation. Cross-examination of Sloane would be useless. His report is an open book; it stands in contrast to D’Amico’s report and testimony. Further proceedings would only exacerbate the expense and delay of which petitioner has been most vocal in complaining thus far.
Upon restoration to the calendar, the motion to reject The Report and to make new findings is granted, and the fair value of petitioner’s shares as of May 23, 1992, is fixed at $19,800. *100 That branch of the motion to confirm The Report is denied, and the cross motion to hold this matter in abeyance is denied as moot.
Settle judgment including offsets with interest for petitioner’s share of respondent’s advances to Sloane.

. This order was amended on January 23, 1995, to require the parties to share the expenses of the court-appointed appraiser in proportion to petitioner’s 32.2% stock ownership in the respondent corporation.

. This was dictum because the issue of the fair value of petitioner’s shares was not presented to the Appellate Division for determination. That Court had none of the benefit of the details that will be discussed in this opinion that are requisite to an appropriate review of the fair value of respondent corporation as of the valuation date, May 23, 1992.

. Parenthetical references "Tr.” refer to the transcript of testimony before the Special Referee.

. Petitioner’s posture respecting Wishman’s compensation undermined her own expert who led the Special Referee into error when he testified that he questioned the reasonableness of this salary: "I think that if you were saying the company makes no money, and in light of [sic] that Mr. Wishman is making $115,000 [an overstatement, see, Tr., at 101-3] a year, I find those two facts contradictory.” (Tr., at 726-727.)