OPINION OF THE COURT
Stephen G. Crane, J.
Following the conclusion of a reference to determine the value of the plaintiff’s 45% share in the corporation Kings Antiques Corp., plaintiff Richard Hall moves (motion sequence No. 012), pursuant to CPLR 4403 to correct or vacate the Referee’s Report dated November 26, 1997 (the Report). Defendant Donald King moves to confirm the Report, and for other relief (motion sequence No. 013 [014 as amended]). These motions are consolidated for decision.
I. BACKGROUND
Kings Antiques Corp. (Kings Antiques or the corporation) is a well-established firm dealing in high quality reproduction antique furniture and accessories. Plaintiff and defendant are brothers who worked together in Kings Antiques for almost 30 years before their recent, unfortunate falling out. Defendant, the founder of the firm, is the owner of 55% of the corporate stock; plaintiff owns 45%. Plaintiff originally began this action to enjoin a shareholders’ meeting. At the suggestion of Justice Stuart Cohen, plaintiff filed a petition for dissolution pursuant to Business Corporation Law § 1104-a on February 15, 1996[1] under the original index number of his injunction action. Defendant elected, pursuant to Business Corporation Law § 1118, to purchase plaintiff’s stock at its fair value to be determined at a reference.
According to the language of the order of Justice Stuart Cohen, filed July 2, 1996 (the “Order of Reference”), the Referee was directed to hear and report[2] to the court concerning “the fair value of plaintiff’s shares in Kings Antiques Corp. as of February 14, 1996, and any adjustments and/or surcharges *129 that are necessary or appropriate, and the terms and conditions upon which Donald King will purchase said shares.”
The matter was heard over a total of five days by Referee Julius Bimbaum. The Referee heard testimony from a number of witnesses, including the parties and their experts, and accepted numerous documents into evidence. The Referee chose to accept the testimony of one of two of defendant’s experts, who, using the “net asset” approach to evaluating the stock’s fair value, and utilizing a 25% lack of marketability discount, determined that the value of the plaintiffs stock as of February 14, 1996 was $1,333,000. The Referee chose to take no position, but left to the court determination of two issues raised in the reference, to wit, “whether the sum of $360,000 cash distribution made to Richard Hall after February 14, 1996 should be deducted from any finding of value,” and “whether bad faith may be inferred and found by the Court of Hall’s actions to deny him payment of interest on the fair value of his 45% stock interest.”
II. NATURE OF MOTIONS
Plaintiff objects to the Referee’s findings on several grounds maintaining that the Referee (1) improperly admitted evidence regarding facts which occurred after the valuation date of February 14, 1996, and relied upon that evidence in his Report; (2) relied on an “improper valuation theory and improper application of a marketability discount” so as to arrive at a value for the plaintiffs shares which “could not logically or reasonably be drawn from the overwhelmingly contrary evidence in the record”. Plaintiff’s own expert, using a discounted cash flow approach to the stock valuation and a 10% lack of marketability discount, determined that plaintiffs stock should be valued at $2.56 million. Defendant, on the other hand, seeks confirmation of the Referee’s Report as is. He seeks a finding that distributions in the sum of $360,000 made to plaintiff by the corporation after the valuation date must be deducted from the value of plaintiffs shares and that the plaintiffs bad faith precludes an award to him of interest.
III. DISCUSSION
A. Standards
The report of a Referee should be confirmed if the findings are supported by the record. (Plaza Funding Corp. v J. C. Dev. Corp., 155 AD2d 298 [1st Dept 1989].) “ ‘[T]he Referee, as trier *130 of fact, is * * * in the best position to determine the issues presented.’ ” (Supra, at 298.) Issues of credibility, especially, should be resolved by the Referee. (Credit Car Leasing Corp. v Litwer, 168 AD2d 319 [1st Dept 1990].)
B. Issues
i. Propriety of Evidentiary Submissions
The entire record reveals that the Referee’s Report is not based on evidentiary material after the valuation date of February 14, 1996, despite some testimony concerning events occurring thereafter and some reference to such matters in the background section of the Report. Nor did the Referee err in accepting evidence of this nature, since some of the issues involve events postdating February 14, 1996 (such as the propriety of the disputed distributions). Therefore, the Report will not be disturbed on these grounds.
ii. Method of Valuation
It has been recognized that the court’s obligation to determine the fair value of a minority interest in a closely held corporation “presents a difficult problem.” (Matter of Blake v Blake Agency, 107 AD2d 139, 146 [2d Dept], lv denied 65 NY2d 609 [1985].) The value of the corporation itself “should be determined on the basis of what a willing purchaser, in an arm’s length transaction, would offer for the corporation as an operating business, rather than as a business in the process of liquidation”. (Supra; see also, Matter of Friedman v Beway Realty Corp., 87 NY2d 161 [1995].) Plaintiff’s expert, Paul Mallarkey, considered two accepted valuation methods, a capitalization of income analysis, and a discounted cash flow analysis. He used the latter on the grounds that the former method produced too low a figure. The first of the defendant’s two valuation experts, Doreen Johns, also used a discounted cash flow analysis to arrive at the figure of $1,174,000 as the value of plaintiff’s 45% interest in the corporation. The Referee, however, chose to rely on the testimony of William Lockwood, defendant’s second expert, who employed a net asset approach. The Referee rejected the testimony of plaintiff’s expert, Mallarkey, as being “questionable” on several articulated grounds, and discounted that of Doreen Johns as being “too conservative”.
According to the plaintiff, the Referee erred in relying on the testimony of William Lockwood, because, as the Referee himself noted, the net asset approach is a “balance-sheet oriented approach that indicates specific components of business value *131 without provisions for future business and new business” (Referee’s Report, at 6), i.e., it is directed at determining the present assets of a corporation, not its future potential. Courts have noted, in general, that “[t]he net asset method relies heavily on accounting methods which do not provide an accurate measure of a going business” because “[i]t does not value certain intangibles which, by their nature, may have infinitely more value than the tangibles, such as good will, [and] location”. (Matter of Taines v Gene Barry One Hour Photo Process, 123 Misc 2d 529, 535 [Sup Ct, NY County 1983], affd 108 AD2d 630 [1st Dept 1985], lv denied 67 NY2d 602 [1986].)
There is no reason to second-guess the Referee’s credibility findings of the various witnesses including William Lockwood. Lockwood’s reliance upon the net asset approach was not improper despite the anticipated continuation of Kings Antiques as a business. Lockwood explained that he gave minimal consideration to the issue of goodwill in his valuation because there was no noncompete clause between the parties. The lack of such a provision (and hence, the possibility that there will be competition from the sellers), detracts considerably from the value of the corporation to a potential purchaser. However, Lockwood did not discount goodwill entirely in his calculation of the corporation’s net assets. Recognizing that Kings Antiques was an ongoing business and that a net asset approach as ordinarily utilized would not address the specifics of an ongoing business, Lockwood devised a formula for calculating goodwill. This involved an estimate of the amount of business a buyer could expect to retain after purchase of the corporation in the absence of a noncompete clause. He then added the sum derived, $309,846, in his calculation of the corporation’s value under a traditional net asset approach. Therefore, Lockwood has satisfactorily explained why he utilized the net asset approach in valuing a going concern and how he rectified the flaw in the method perceived in Taines (supra).
iii. Lack of Marketability Discount
Both parties apparently agree that it was proper to apply a lack of marketability discount to the valuation of plaintiff’s shares. However, plaintiff argues that the amount applied, 25% is excéssive, and that the discount was wrongly applied.
A lack of marketability discount is utilized in the valuation of the stock in closely held corporations. It is “a discount to reflect the illiquidity of [a] petitioner[’s] shares, i.e., that a *132 potential investor would pay less for shares in a close corporation because they could not readily be liquidated for cash”. (Matter of Friedman v Beway Realty Corp., supra, 87 NY2d, at 165.) The parties dispute, however, whether it was proper to utilize a discount of 25%, or whether a smaller discount (which would realize a larger value) should have been applied. Plaintiff pushes for the 10% lack of marketability discount employed by his expert, Paul Mallarkey.
Although a 10% lack of marketability discount has been accepted as appropriate in certain valuations (see, e.g., Matter of Carolina Gardens v Menowitz, 238 AD2d 189 [1st Dept 1997]; Matter of Joy Wholesale Sundries, 125 AD2d 310 [2d Dept 1986]), case law does not require the use of this figure, and, in fact, other courts, in other circumstances, have utilized a number of different figures, based upon the evidence. (See, e.g., Matter of Blake v Blake Agency, 107 AD2d 139, supra [applying a 25% discount]; Matter of Whalen v Whalen’s Moving & Stor. Co., 234 AD2d 552 [2d Dept 1996] [applying a 20% discount]; Lehman v Piontkowski, 203 AD2d 257 [2d Dept] [applying a 25% discount], lv dismissed 84 NY2d 890 [1994].)
Both of the defendant’s valuation witnesses approved a lack of marketability discount greater than 10%. Both justified their choice of a figure by reference to an accepted range of lack of marketability discounts as set forth in various appraisers’ studies of private stock transactions. Lockwood testified that the average lack of marketability discount in such studies is “in the 25 to 45 percent range.” (Transcript of hearing, at 677.)[3] There is, therefore, support in the record for using a 25% discount.
Plaintiff contends, for the first time on these motions, that it was error to apply the 25% lack of marketability discount to the entire valuation of the stock. He argues that a lack of marketability discount should only be applied to reduce the value of a corporation’s intangible assets (i.e., its goodwill), and not its tangible assets which do not lose their value merely because they are owned by a closely held corporation. (Matter of Blake v Blake Agency, supra; Matter of Whalen v Whalen’s Moving & Stor. Co., supra; Matter of Cinque v Largo Enters., 212 AD2d 608 [2d Dept 1995].) Yet, plaintiffs expert, in his report admitted before the Referee as exhibit 7, applied the *133 “lack of marketability” discount to the entire $6,327,000 that he derived as the value for the entirety of the common stock.[4]
In Matter of Blake (107 AD2d, supra, at 149), the Appellate Division, Second Department, approved of a discount recognizing the lack of marketability of the shares of a close corporation. It just so happens that the calculation in that case {supra, at 150) applied this discount only to goodwill. There was no discussion of this limitation in the application of the lack of marketability discount anywhere else in the opinion. Indeed, in one of the authorities Blake cited in approving use of such a discount, Lyons and Whitman, Valuing Closely Held Corporations and Publicly Traded Securities with Limited Marketability: Approaches to Allowable Discounts from Gross Values (33 Bus Law 2213), there is not the slightest hint that the discount is restricted to goodwill. That authority, in considering the lack of marketability discount, discussed the valuation of the shares of a closely held corporation and the lack of marketability of the “shares”, not of the goodwill belonging to the corporation. (Id., at 2215-2216.) These authors cited, inter alia, Central Trust Co. v United States (305 F2d 393, 405 [Ct Cl 1962]). In the extensive discussion of lack of marketability in that case, not a murmur is heard restricting the concept to goodwill. (Supra, at 405-412.) In Matter of Seagroatt Floral Co. (Riccardi) (78 NY2d 439, 445-446 [1991]), this same article is discussed in terms of valuing the enterprise with consideration of the illiquidity of the shares. Seagroatt also cites O’Neal and Thompson, O’Neal’s Close Corporations (vol 2, § 9.34, at 162-163 [3d ed]). Even that authority discusses no limitation of the illiquidity discount although the 1997 Cumulative Supplement to footnote No. 41 of section 9.34 mentions the Whalen case (supra) on which plaintiff at bar is relying for this restriction.
To ice the cake, the Second Department that decided Blake (supra) on February 25, 1985, Justice Thompson writing, Presiding Justice Mollen, Justices Titone and Weinstein, simultaneously decided Matter of Fleischer (107 AD2d 97 [2d Dept 1985]) in which the lack of marketability discount was taken against the total value, not just against goodwill. And, Justice Thompson saw fit to cite his simultaneous opinion in Blake. (Matter of Fleischer, at 101.)
Then the Second Department brought us Whalen (supra, at 554) and Cinque (supra, at 609-610). In each of these cases the Court stated flat out that the discount for lack of marketability *134 should only be applied to the portion of the value of the corporation attributable to goodwill. The authority each decision invoked for this proposition was Blake (supra).
It is respectfully submitted that these two cases are incorrectly decided insofar as the limitation of the discount is concerned. In addition to the lack of support in the genealogy of this limitation, it flies in the face of pronouncements of the Court of Appeals. The unmarketability discount is supposed to be taken against “the aggregate net asset value of the corporations”. (Matter of Friedman v Beway Realty Corp., supra, 87 NY2d, at 166.) It is an adjustment for the “risk associated with illiquidity of the shares” (Matter of Seagroatt Floral Co. [Riccardi], supra, at 446 [emphasis added]), not just of the corporate goodwill.[5] The undiscounted shares and their value represent a proportionate interest in the entire corporation, not just its goodwill. O’Neal and Thompson and Lyons and Whitman set forth the same all-embracing analysis for the unmarketability discount.
The conceivable basis for the restriction, though not discussed in Whalen (supra) or Cinque (supra), is that the tangible assets of the corporation are readily saleable but not so its goodwill or other intangibles. Not only does such an explanation fly in the face of controlling language in opinions of the Court of Appeals, it rests on a faulty foundation. Goodwill is certainly a vendable asset. (Spaulding v Benenati, 57 NY2d 418, 422 [1982]; Lehman v Piontkowski, supra, 203 AD2d, at 258.) Indeed, goodwill is subject to the same fluctuations in value as are tangible assets. Thus, the line of Second Department cases limiting the unmarketability discount appears to lack any valid theoretical underpinning.
Nevertheless, this court would be required to follow this erroneous Second Department case law in the absence of any contradictory rulings from the First Department (1 CarmodyWait 2d, NY Prac § 2:249 [rev ed]), unless, as it strongly appears, the Second Department decisions conflict with the Court of Appeals determinations on this point. (Id., at § 2:243 [rev ed].) There appears to be a determination, without discussion, by the First Department, that conflicts with the Second Department limitation to goodwill in the application of the lack of *135 marketability discount. (See, Matter of Cohen [Four Way Features], 168 Misc 2d 91, 98-99 [Sup Ct, NY County 1995] [Crane, J.], affd 240 AD2d 225 [1st Dept 1997].) There were abundant intangible assets in that case. Yet the discount applied not to the underlying assets owned by the corporation, but to the “value” of the shares.
An additional reason emerges for the court declining to apply the limitation on the discount for lack of marketability. By propounding an expert opinion before the Referee that predicated the lack of marketability discount on the entire value of the corporation, plaintiff is estopped on these motions from contending that the discount should be limited to goodwill. (57 NY Jur 2d, Estoppel, Ratification, and Waiver, §§ 25, 48.) These inconsistent positions deprived the Referee of an opportunity to consider the proposition and prejudiced defendants from cross-examining Mallarkey or eliciting testimony from their own expert addressed to this limitation.
iv. Distributions
After the valuation date plaintiff allegedly arranged for two distributions of $180,000 each to himself (at the same time, distributions of $220,000 were made to defendant). The first, on February 15, 1996, was made with defendants’ approval, though King now asserts it was in error.[6] Plaintiff asked for the distribution, while simultaneously filing his petition for dissolution. Defendant claims that he did not know that the petition had been filed when he permitted the distribution. The second distribution on April 10, 1996 was allegedly improper because plaintiff did not have authority to make it without defendant’s approval.
Defendant maintains that these distributions should be deducted from the value of the plaintiff’s 45% interest in the corporation. Plaintiff insists that the distributions were lawfully made, at a time when he was still an officer of the corporation, so that he is entitled to retain them in addition to the amount he will receive from defendant upon the sale of his shares. The Referee left determination of this issue to the court.
*136 Defendant’s valuation expert, William Lockwood, testified that the distributions made to plaintiff after the valuation date would have to be deducted from the value of the plaintiff’s shares because they necessarily impact on the value of the corporation measured by the net asset method.[7] The second $180,000 distribution was never approved or ratified, whether or not it was made by plaintiff’s wrongdoing. This renders inapplicable to the second distribution the case of Matter of Scognamillo (Patsy’s Italian Rest.) (169 AD2d 575 [1st Dept], lv denied 78 NY2d 859 [1991]), where the distributions were approved or ratified. By the same token, Scognamillo prevents reduction for the first distribution of $180,000 which was approved.
v. Interest
Pursuant to Business Corporation Law § 1118 (b), “the court, in its discretion, may award interest from the date the petition is filed to the date of payment for the petitioner’s share at an equitable rate upon judicially determined fair value of his shares.” Plaintiff is entitled to interest on his share of the corporation’s value, “unless a determination is made that [plaintiff] has acted in bad faith.” (Matter of Blake v Blake Agency, supra, 107 AD2d, at 150; see also, Matter of Joy Wholesale Sundries, 125 AD2d 310, supra.)
Defendant seeks to bar interest based on Hall’s actions in allegedly engaging in competition with Kings Antiques while he was still employed by the corporation. Defendant also maintains that plaintiff should be denied interest due to the “inordinate delays” in the proceedings to date which defendant attributes solely to the plaintiff.
Defendant incorrectly states that the Referee “found” that plaintiff was engaging in unfair competition with the corporation while still in its employ. The Referee pointedly refrained from making a determination as to whether “bad faith may be inferred by the Court of Hall’s actions to deny him payment of interest”. (Report, at 9.) The evidence of bad faith is inconclusive and does not warrant denying interest. *137 Clearly, plaintiffs son was planning to enter into competition with Kings Antiques, and the Referee was undoubtedly correct in surmising that plaintiffs loyalties were with his son, but the evidence does not establish that plaintiff engaged in acts in direct competition with the corporation during the critical period. There is, further, no evidence that the plaintiff caused any undue delay in the proceedings, assuming that such acts could, in and of themselves, constitute “bad faith” to warrant a denial of interest. Therefore, plaintiff is entitled to interest at the legal rate of 9% (CPLR 5004) on his 45% share of the fair value of Kings Antiques, from February 15, 1996.
vi. Terms and Conditions of Payment
The Special Referee failed to discharge that part of the Order of Reference that required him to report on the terms and conditions for the purchase of plaintiffs shares. The parties on these motions make no submissions on this subject. No reason has been offered to delay the purchase of plaintiffs shares in Kings Antiques Corp. Therefore, the parties should, in the judgment to be settled hereon, specify the terms for cash payment and a reasonably prompt closing date.
vii. Plaintiffs Salary
The issue of whether plaintiff is owed salary is not properly before the court on the present motion. This issue was not before the Referee. Plaintiff raised it tardily on this motion. The Order of Reference included issues of necessary and appropriate adjustments and surcharges. Since plaintiff never asked the Referee for adjustment upward for withheld salary, he has waived the issue.
IV. CONCLUSION
The fair value of the plaintiffs 45% interest in Kings Antiques Corp. is $1,333,000, less the unapproved second distribution made to him in the sum of $180,000, for a total of $1,153,000, plus interest at the rate of 9% calculated from February 15, 1996.
Accordingly, it is ordered that the plaintiffs motion to correct or vacate the Special Referee’s Report is denied; and it is further ordered that defendant Donald King’s motion is granted to the extent of confirming the Report and deducting $180,000 *138 from the value found by the Special Referee and otherwise denying his application to award no interest thereon.
Settle judgment including terms for cash payment and a reasonably prompt closing date.

. Valuation is measured as of the day preceding the date on which the petition pursuant to Business Corporation Law § 1104-a was filed. (Business Corporation Law § 1118 [b].)

. A reference to hear and report is available in an appraisal proceeding under Business Corporation Law § 1118. (See, Matter of Cohen, Sup Ct, NY County, Sept. 29, 1994, Crane, J., index No. 14365/92, affd 215 AD2d 341; Matter of Mitchell v A.J. Med. Supply, 141 AD2d 732, 734.)

. Defendant’s other valuation witness, Doreen Johns, chose to apply a lack of marketability discount of 25% based on a range of lack of marketability discounts of between 25 to 70%.

. See also, plaintiffs proposed finding of fact No. 44, dated July 14, 1997.

. Even the Second Department, after Blake (supra) and before Whalen (supra) and Cinque (supra), recognized that the discount applies to the value of the shares without limitation to the underlying corporate goodwill. (Matter of Raskin v Walter Karl, Inc., 129 AD2d 642, 644 [2d Dept 1987]; Matter of Joy Wholesale Sundries, supra, 125 AD2d, at 311.)

. Apparently, King’s error consisted of his ignorance of the filing of the petition for dissolution on the same date and his lack of prescience that if he, King, invoked the remedy of Business Corporation Law § 1118 the valuation date would be the day preceding the distribution (see, n 1, supra) with its impact on value if the net asset method were adopted by the court (see, n 7, infra). The court will not recognize these contingencies as an error particularly in the circumstances here. King was already in litigation with his brother for many months.

. Apparently, plaintiff agreed, at least in front of the Referee. In plaintiff’s “Proposed Findings of Fact and Conclusions of Law Regarding the Fair Value of His Interest in Kings Antiques Corp.”, dated July 14,1997, and submitted to the Referee, plaintiff stated that “Richard Hall was entitled to these distributions as part [of] his 45% interest in profits generated by the business prior to the February 14, 1996 valuation date”. (Id., at 19 [emphasis supplied].)