[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16190

_____

D. C. Docket No. 04-00698-CV-ORL-28-KRS

COX ENTERPRISES, INC.,
a Delaware corporation,

Plaintiff-Appellee
Cross-Appellant,

versus

NEWS-JOURNAL CORPORATION,
a Florida corporation,

Defendant-Appellant
Cross-Appellee,

HERBERT M. DAVIDSON, JR., et al.,

Defendants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(December 21, 2007)**

Before BIRCH  and BARKETT, Circuit Judges, and KORMAN,[*] District Judge.

BIRCH, Circuit Judge:

Defendant-appellant News-Journal Corporation ("NJC") appeals the determination made by the district court of the "fair value" of stock held by plaintiff-appellee, Cox Enterprises, Inc. ("Cox"), pursuant to Fla. Stat. § 607.1436 (2003).  Cox cross-appeals, arguing that, although the valuation method was proper, the district court ought also to have included compensation for past misconduct in its "fair value" calculation.  Cox also challenges the district court's refusal to award prejudgment interest.  We AFFIRM the district court's determination.

## I. BACKGROUND

Cox is a privately held Delaware corporation with its principal place of business in Atlanta, Georgia.[1]  It owns seventeen daily newspapers, including The Atlanta-Journal Constitution, Austin American-Statesman, Dayton Daily News, and Palm Beach Post.  NJC is a closely held Florida corporation with its principal place of business in Daytona Beach, Florida.  NJC publishes the Daytona Beach News-Journal ("News-Journal"), a daily newspaper circulated primarily in

---

[*]Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[1]The facts necessary to our decision were well stated by the district court in its opinion, from which we generously borrow for purposes of our statement of the case

2

Volusia and Flagler Counties. NJC has one wholly owned subsidiary, Volusia Pennysaver, Inc. ("Pennysaver"), which publishes six local shopping guides.

NJC was organized in 1925 through the consolidation of two small Daytona Beach newspapers to form the News-Journal. NJC has one class of common stock of which 4,000 shares are outstanding. Members of the Davidson family purchased a controlling interest in NJC in 1927 and PMV, Inc., a closely held corporation controlled by the Estate of Herbert M. ("Tippen") Davidson, Jr., owns those 2,100, or 52.5%, of NJC's shares. Cox acquired the remainder of the NJC stock in 1969 and has maintained its 47.5% interest since that time.

When the case came before the district court, NJC's directors were Tippen Davidson, Marc Davidson, Julia Davidson Truilo, Robert Truilo, Georgia Kaney, Jonathan Kaney, Jr., and David Kendall. Tippen Davidson also served as the president and CEO of NJC until his death in January 2007. Tippen Davidson's grandfather, Julius, served as the News-Journal's publisher from 1927 until 1962, when he relinquished control of the paper to his son Herbert M. Davidson. Herbert published the paper until his death in 1985. Under Julius and Herbert's leadership, NJC also owned and operated a radio station, WNDB-FM, from 1944 to 1972.

Although Tippen Davidson enjoyed a brief career as a professional musician, he eventually returned to Daytona Beach to work as a reporter and city

editor for the News-Journal. Upon his father's death, he became the paper's general manager and publisher. Tippen's wife, Josephine, has also worked as a reporter and editor at the News-Journal. Their two children, Marc Davidson and Julia Davidson Truilo, are currently members of the News-Journal staff and the NJC board of directors. Julia's husband, Robert Truilo, serves on the board of directors and as the News-Journal's business manager.

In his capacity as CEO of NJC, Tippen Davidson continued to pursue his interest in music and the performing arts. As early as 1966, he began to help create several non-profit organizations, including the Florida International Festival ("FIF"), Central Florida Cultural Endeavors ("CFCE"), Seaside Music Theater ("SMT"), and Lively Arts Center, Inc. ("LACI") (collectively "Cultural Entities"). SMT, in particular, has consistently depended on funding from NJC. After NJC pledged $1.8 million to SMT in 1993, NJC management developed a "spin-off strategy" according to which contributions to SMT would go down by $180,000 annually until they totaled no more than $500,000 per year. The strategy was never effectively implemented, and, in fact, in 1999, NJC's total contribution to SMT came to $1.4 million. By the following year, this figure had risen to $1.8 million – triple what it had been eight years before.

In 1996, NJC's directors organized LACI as a part of the SMT spin-off strategy. Tippen, Georgia Kaney, Marc Davidson, and Julia Truilo served as its original board of directors. Their goal was to build and operate an independent and upscale performing arts center for SMT, thereby enhancing the stature of SMT and increasing its revenue. The projected cost for the center was $29 million. NJC provided $13 million of this amount as part of a naming rights agreement.[2]

---

[2]In addition to financial support, the Cultural Entities have been intertwined with NJC by common management: Tippen Davidson served as director and vice-chair of LACI, as a producer and an advisory board member of SMT, and as director and president of CFCE. He also served on the board of directors for SMT until 2001.

Marc Davidson serves as director, treasurer, and assistant secretary of NJC, as director and secretary of CFCE. He served as director and secretary of SMT from 1996 to 2001 and as director of LACI from 1996 to 2001. He is also the editor of the News-Journal Online.

Julia Davidson Truilo serves as director and assistant secretary of NJC, as director of LACI, managing director of SMT, and director and vice-president of CFCE. She served as director and vice-president of SMT from 1996 to 2001. Her husband, Robert Truilo, serves as director and assistant treasurer of NJC. He is also director of CFCE and has check-signing authority for CFCE and SMT.

Jonathan Kaney's wife, Georgia Kaney, serves as director, vice-president, and assistant secretary of NJC, as director of LACI, as an advisory board member of SMT, and as director, treasurer, and assistant secretary of CFCE. She was an initial director and treasurer of SMT and served as treasurer, assistant secretary, and director of SMT from 1996 to 2001. Jonathan Kaney serves as director, secretary, and general counsel for NJC and as director, secretary, and treasurer of LACI. Besides serving as counsel to NJC, Jonathan Kaney has also represented SMT, CFCE, PMV, LACI, and Tippen Davidson in his personal capacity.

David Kendall serves as director and vice-president of NJC, as CFO of LACI, as an advisory board member and CFO of SMT, and as CFO of CFCE. He served as director of LACI from 2001 to 2005. Kendall is also the CFO of the News-Journal.

Additionally, over the five-year period leading up to the filing of this action, seventeen CFCE employees, thirty-eight SMT employees, and three LACI employees were on the NJC payroll. Many of the Cultural Entities employees also worked in the News-Journal building and received the same benefits as News-Journal employees.

5

In the beginning, NJC treated its contributions to the Cultural Entities as charitable tax deductions. Over time, however, the donations began to exceed the maximum allowed for charitable deductions. Accordingly, in 1993, NJC began to classify its contributions as business expenses for the purpose of corporate promotion. The district court found these cultural expenditures to have been waste. NJC does not challenge that finding for the purposes of this appeal.

Cox first learned of the $13 million naming rights agreement on 10 March 2004. Unsatisfied with the explanations for this expenditure provided by NJC, Cox filed suit on 11 May 2004, alleging various acts of fraud, waste, and mismanagement. NJC then timely elected to purchase Cox's shares "at the 'fair value' of the shares" pursuant to Florida law. Fla. Stat. § 607.1436(1).[3] Because the parties were unable to come to any agreement, the district court held a bench trial to determine the "fair value" of Cox's shares. Id.

At trial, both sides presented expert testimony. Cox's expert, Owen D. Van Essen, is a partner in Dirks, Van Essen, & Murray, a firm specializing in the valuation of newspapers. Van Essen's firm has valued in excess of ten billion

---

[3]Under Florida law, a shareholder asserting injurious waste or misapplication of corporate assets, or illegal or fraudulent acts by directors or management of a corporation may bring suit for dissolution of the corporation. Fla. Stat. § 607.1430. To avoid dissolution, the remaining shareholders may elect to purchase all shares owned by the petitioning shareholder pursuant to Fla. Stat. § 607.1436.

6

dollars worth of transactions in its twenty-five year history and more than fifty percent of the daily newspaper transactions in the United States over the past decade. Prior to joining the firm, Van Essen worked exclusively in the newspaper business, and was, at one point, general manager/business manager and part owner of a daily newspaper. On the basis of this background, the district court concluded that Van Essen was "plainly qualified to provide testimony regarding the fair value of Cox's shares." R16-251 at 15.

Van Essen's starting point in valuing Cox's shares was the fair market value of the News-Journal as a "going concern."[4] To determine fair market value, Van Essen used a comparable sales analysis, which measures the market value of a newspaper primarily in relation to the purchase prices of comparable newspapers.[5] Van Essen began his analysis by comparing NJC's Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") margin to the average EBITDA or operating margin of eleven publicly traded newspaper companies. In comparison to NJC's operating margin of 9.3%, the eleven publicly traded newspaper companies had an average operating margin of 28.3%. Relying on this

---

[4]Van Essen valued NJC as a "going concern" because it was "a dominant business in that market, . . . [with] an assembled group of employees, [which is] in no danger of going out of business." R27 at 392-93.

[5]The News-Journal is the 99th largest daily newspaper in the United States in terms of circulation. It is the 11th largest independently owned paper in the country, and, in Florida it is second only to the St. Petersburg Times. R7-141. Exh. 1 at 10.

data, Van Essen normalized NJC's operating margin to 28.3%. R27 at 396-97, 399.

From a database of over 1000 newspaper transactions, Van Essen selected seven transactions involving newspaper companies comparable to the News-Journal. Id. at 400; R7-141, Exh. 1 at 8. Van Essen selected the comparables based on 50[6] different measures, including growth, circulation, financial metrics, and market characteristics. He then calculated the average purchase price-to-revenue and purchase price-to-EBITDA ratios of the comparable companies. After excluding two due to abnormally high ratios, Van Essen determined that the remaining comparables had an average purchase price-to-revenue ratio of 4.1:1 and an average purchase price-to-EBITDA ratio of 14.4:1. R27 at 407.

In a slight departure from his standard approach, Van Essen then adjusted his multipliers downward in order to account for NJC's higher than average capital expenditures and a possible reduction in NJC's growth rate. Id. Thus, Van Essen determined that the News-Journal's fair market value as of 10 May 2004 was $270 million. Id. at 408. Under a similar analysis, Van Essen further determined that

---

[6]Although the trial transcript indicates that Van Essen used 150 measures, R27 at 395, the printed expert report says 50. R7-141, Exh. 1 at 8. Either way, it is a significant number of measures.

the fair market value of Pennysaver was $36 million. Id. at 412. Accordingly, Van Essen concluded that NJC's fair market value was $306 million and that Cox's 47.5% share of that total – and thus the relevant "fair value" – came to $145,350,000. Id. As a check on the market approach, Van Essen also conducted a discounted cash-flow analysis of NJC. Using a projected growth rate of 6%, as in his view was appropriate to NJC's circumstances, and a normalized operating margin of 28.3%, Van Essen concluded that NJC's fair value under the discounted cash-flow analysis was $289 million.[7] R7-141, Exh. 1 at 17.

NJC's expert, Robert E. Duffy is a certified public accountant and partner in the firm of Grant Thornton. He is also accredited as a senior appraiser by the American Society of Appraisers. Unlike Van Essen, however, Duffy has had little experience in valuing newspapers. His specialty is in gift taxation and complex dissolutions of marriage. Complex dissolutions of marriage account for approximately 90% of Duffy's practice. Based on this background, the district court also found Duffy to be qualified as an expert, "though appreciably less so than Van Essen." R16-251 at 17-18.

---

[7]The district court noted that, at some point prior to NJC's election to purchase Cox's shares, Van Essen, at the request of David Kendall, roughly estimated NJC's value (simply multiplying gross revenues by four) as approximately $320 million. R16-251 at 17 n.10; see R27 at 428-29. The court further noted the opinion of Jay Smith, who had many years of experience in pricing newspapers, that the fair market value of NJC was $325 million. R16-251 at 17 n.10 (citing R25 at 95-96).

In assessing the value of NJC, Duffy relied on discounted cash-flow analysis – estimating the value of a company according to the present value of its anticipated future cash flow. The discounted cash-flow model has four components: (1) estimated earning capacity; (2) cash flow adjustments to the earning capacity; (3) a discount rate to discount future cash flow to present value; and (4) a long-term growth rate to reflect growth in earnings and cash flow beyond the end of the forecast period.

Like Van Essen, Duffy operated from the premise that NJC should be valued as a going concern. Duffy's definition of "going concern" was influenced by Jonathan Kaney's suggestion that valuing a company as a going concern rests on the assumption that a company will operate in the future exactly as it has in the past. Duffy further assumed that, in a hypothetical sale of NJC, (1) the "current controlling shareholder group and current business model [of NJC would] remain intact,"; (2) purchase of the entire company by a "strategic buyer" should not be considered; and (3) "no material change to [NJC's] operations, capital structure, business model or profitability" would have resulted from the sale. R31 at 1171.

Duffy began his analysis by estimating the future projected cash flow of NJC from 9 May 2004 onward. He then predicted, on the basis of conversations with NJC management, that NJC would operate for two-and-a-half years at its

10

presently low EBITDA margin of roughly 12% but would thereafter operate at a higher EBITDA margin comparable to the margins the company enjoyed during the five-year period from 1998 through 2002. Id. at 1175. After accounting for an anticipated reduction in NJC's corporate contributions to $500,000 per year, Duffy determined that NJC would eventually operate at an 18.3% EBITDA margin. Id. at 1178. Based on these projections, Duffy concluded that NJC's cash flow in 2012 would be approximately $8.2 million. Id. at 1189-90.

Using the Gordon Growth Model and applying a capitalization rate of 10% (subtracting a projected long-term growth rate of 4% from a discount rate of 10%), Duffy projected a future cash flow of $82 million. Id. at 1190. After discounting this amount to a present value of $61,984,000, Duffy added back the present value of the initial "discrete two and a half year cash flows" and concluded that the aggregate value of NJC was $72.9 million. Id.

An additional $3,269,000 to account for a tax shield related to the depreciation of NJC's naming rights and another $1,150,000 for a tax shield related to building depreciation resulted in an adjusted aggregate value of $77,386,000. See id. at 1180, 1191. Based on studies of restricted stock, Duffy then applied a 20% lack of marketability discount to NJC's value, yielding a final

11

estimated value of $61,909,000.  Id.  at 1198.  In Duffy's opinion, the fair value of

Cox's 47.5% as of 10 May 2004 was $29,410,000.  Id.

The district court, crediting Van Essen's testimony, adopted the fair market

value/comparable sales analysis methodology for determining the fair value of

Cox's shares.  The court reasoned that this method is generally accepted in the

financial community and protects minority shareholders.  The court rejected

Duffy's methodology on the ground that it would reward wrongdoing by

permitting NJC to purchase Cox's shares at a bargain price.  More specifically, the

court reasoned that accepting Duffy's "definition of a going concern would, in

essence, create an incentive for those with control over corporations to violate

fiduciary duties, waste corporate assets, and drive down the value of minority

shares."  R16-251 at 24.  Instead, the court defined a going concern as "a

corporation [that] will be managed in a reasonably prudent manner going forward,

regardless of how poorly it may have been run in the past."  Id.

Concluding that it would have been more appropriate for Van Essen to

normalize NJC's operating margin to that of the average of similarly situated

papers identified in his comparables (24.8%) rather than to that of eleven publicly

traded newspaper companies (28.3%), the court recalculated Van Essen's numbers.

Accordingly, the court found a fair market value as of 10 May 2004 for the News-

12

Journal of $236 million, which combined with the $36 million fair market value of Pennysaver, yielded a total of $272 million. Finally, the court concluded that the fair value of Cox's 47.5% interest in NJC was $129,200,000. Id. at 33.

On appeal, NJC challenges the district court's definition of "going concern," its use of "fair market value" as part of its calculation of "fair value," and its normalization of the News Journal's operating margin. In its cross-appeal, Cox argues that the district court should have further adjusted its "fair value" determination to account for mismanagement and corporate waste, and that the court should have awarded Cox prejudgment interest for the period between the valuation date and the entry of judgment.

## II. DISCUSSION

Fla Stat. § 607.1436 gives the court charged with valuing shares in a corporation discretion to determine the most appropriate valuation method by which to arrive at "fair value." See G&G Fashion Design, Inc v. Garcia, 870 So. 2d 870, 873 (Fla. Dist. Ct. App. 2004) ("A trial court's selection of one valuation method over another does not require reversal.") (also citing In re Walt's Submarine Sandwiches, Inc., 569 N.Y.S. 2d 492, 493, 173 A.D. 2d 980, 980 (N.Y. App. Div. 1991) ("The valuation process is fact specific with an emphasis on the particular circumstances of the case . . . .")); see also In re Blake v. Blake Agency,

13

486 N.Y. S. 2d 341, 347, 107 A.D. 2d 139, 146 (N.Y. App. Div. 1985) ("The factors to be considered [in determining 'fair value'] are, inter alia, market value, investment value, and net asset value, [and t]he weight to be accorded each factor depends upon the circumstances of the particular case.) (citations omitted).[8]  When trial judges are given such discretion, "we review only for an abuse of that discretion." FDIC v. Morley, 915 F.2d 1517, 1523 (11th Cir.  1990).  In reviewing for abuse of discretion, we recognize the existence of a "range of possible conclusions the trial judge may reach," and "we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1238 (11th Cir. 2007).

A. Consideration of Fair Market Value

Florida courts have explained that determination of "fair value" for the purposes of the election statute "rests on determining what a willing purchaser in an arm's length transaction would offer for an interest in the subject business." G&G Fashion Design, 870 So.2d at 871; see also Friedman v. Beway Realty Corp., 661 N.E. 2d 972, 976 (N.Y. 1995) (applying New York statute similar to Florida's

---

[8]Florida courts have "rel[ied] on New York case law as persuasive" in interpreting the term "fair value" for purposes of the election statute.  Munshower v. Kolbenheyer, 732 So.2d 385, 386 (Fla. Dist. Ct. App. 1999).

statute). This is not to say that "fair value" is synonymous with "fair market value." Most courts have rejected the notion of such synonymity. See Boettcher v. IMC Mortg. Co., 871 So.2d 1047, 1052 (Fla. Dist. Ct. App. 2004). However, the terms are not mutually exclusive. On one hand, as Florida courts have explained, where "fair market value" would take into account appreciation or depreciation in anticipation of corporate action such as a merger or acquisition, the valuation process under § 607.1436 must exclude both positive and negative effects of any such impending transaction. Id. On the other hand, a court may use fair market value as an estimate of "fair value" when such potentially distorting corporate actions are not at issue. See, e.g., G&G Fashion Design, 870 So.2d at 872-73 (affirming trial court's reliance on market value approach and evidence of good faith, bona fide, arm's length offer for minority shareholder's shares in determination of "fair value").[9]

Accordingly, Florida courts have recognized that valuation proceedings necessarily confront them with "a variety of evidence and methods aimed at determining the price of minority interests." Id. at 871-72 (quotation and citation omitted). In valuing a corporation, a court "should consider proof of value by any

---

[9]NJC complains that the district court substituted a "fair market value" standard for the "fair value" standard provided by the statute. See Appellant's Reply Br. at 11-12. This is confusing the issue; the district court used a fair market value method to determine "fair value" pursuant to § 607.1436 as was appropriate to the circumstances of this case.

15

techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court . . . . [such as] net asset values, market price, earnings, and the like." Boettcher, 871 So.2d at 1053 n.6 (quotation and citation omitted).

Here, the district court first found that NJC was a marketable corporation – two "viable businesses that would command an attractive price on the open market." R16-251 at 23. Consequently, in the absence of any imminent merger, acquisition or other distorting corporate action, the court found that the fair market value/comparable sales valuation method used by Van Essen was that most appropriate to this case and weighted Van Essen's testimony accordingly. The court then made adjustments to Van Essen's calculations to give greater weight to the News-Journal's closely held status. The court adopted its valuation method based upon the circumstances of this case and offered solid reasons for its decision to do so. We find no abuse of discretion.

B. Definition of "Going Concern" and Normalization of EBITDA

The "fair value" of a business should be determined based on the value of that business as a going concern. G&G Fashion Design, 870 So.2d at 872. Although neither party disputes this, NJC challenges the district court's interpretation of the term "going concern." The term "going concern" is generally

16

understood to refer to "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance." Blacks Law Dictionary (8th ed. 2004). In the valuation context, it is generally used in contradistinction to a business that will be liquidated. Essentially, it requires an appraisal to assume the continued operation of the same type and size of business – for NJC, the publication of a daily newspaper and local shopping guides – and to exclude consideration of any merger or liquidation. See Bell v. Kirby Lumber Corp., 413 A.2d 137, 141-42 (Del. 1980) (rejecting argument for net asset valuation because it "presupposes an acquisition value based upon the very fact that the company will not continue in business on the same basis that existed immediately prior to the merger. It introduces another element, namely the value another would place upon it as a price for merger as opposed to the corporation's independent value as a going concern.") (citation omitted). We agree with the district court that a valuation should assume that the business being valued will be managed in a reasonably prudent manner going forward. As the district court reasoned, to apply a definition of "going concern" which requires a valuation on the basis of any previous mismanagement or waste would provide an incentive for majority shareholder/directors to violate fiduciary duties and commit waste to drive down the value of minority shares.

The district court's valuation was unaffected by any potential merger, acquisition or liquidation, and it assumed that the News-Journal would continue to operate as a daily newspaper. Accordingly, we find that the district court did not abuse its discretion in refusing to apply NJC's proposed definition of "going concern."

C. Normalization of Operating Margin

Related to this issue is NJC's argument that the district court erred in its valuation by assuming, based on expert testimony, that NJC was capable of achieving the same level of financial return as other similarly situated newspapers. Again, we observe that the district court noted that the comparable sales method of valuation is a well-accepted method. Van Essen, whose testimony the district court credited, explained his use of the normalized margin, noting that NJC's revenues had been higher than the market average, thereby indicating that NJC's lower operating margin was not the result of a depressed economy. Van Essen then used the average operating margin of eleven publicly traded newspapers comparable to the News-Journal.

The district court reduced this margin and instead used the lower average margin of the seven independent papers among the identified comparables. The district court explained that "normaliz[ing] the financial data of a poorly operated

18

corporation before determining what that corporation would sell for in an arm's-length transaction" better approximates the value of the corporation as a "going concern," or a reasonably prudently managed business. R16-251 at 24-25. The court further explained that "given NJC's poor performance relative to comparably situated newspapers," normalization was justified, albeit according to the slightly lower operating margin of the independent newspapers. Id. at 25. We find no abuse of discretion in this reasoning.

D. Compensation for Past Misconduct

Cox's cross appeal challenges the district court's refusal to readjust its fair value calculation to compensate for past misconduct by NJC management. As previously discussed, we review a court's determination of fair value for abuse of discretion. See G&G Fashion Design, 870 So. 2d at 873; In re Walt's Submarine Sandwiches, 569 N.Y.S.2d at 493, 173 A.D. 2d at 980; In re Blake, 486 N.Y. S. 2d at 347, 107 A.D. 2d at 146; Morley, 915 F.2d at 1523.

Entry of an order directing the purchase of minority shareholdings pursuant to Fla. Stat. § 607.1436 requires the dismissal of the underlying petition for dissolution pursuant to § 607.1430. § 607.1436(6). However, courts have clarified that "fair value" still ought to take into account any effect thereupon of corporate asset waste or other harm caused by mismanagement. See, e.g., In re Gerzof v.

19

Coons, 563 N.Y.S.2d 458, 459, 168 A.D.2d 619, 620 (N.Y. App. Div. 1990);

Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1143 (Del. 1989).

The district court determined, largely in accordance with Cox's expert's report, that the best approximation of the "fair value" of Cox's shares would be 47.5% of fair market value as calculated according to a comparable sales analysis. Although Van Essen did not specifically consider any corporate waste in the course of his comparable sales valuation, he did effectively adjust for any impact previous waste or mismanagement would have had on the value of the shares through normalizing the operating margin to the average level of comparable publicly traded newspapers. The district court slightly adjusted this calculation, normalizing instead to the operating margin of the independent newspapers comparable to the News-Journal. Inefficiencies caused by mismanagement or waste are no less addressed by the court's normalization.

In a comparable sales analysis, corporate waste would affect the estimation of fair value in that it would result in higher expenses, which would, in turn, yield a lower operating margin. Normalizing the operating margin according to that of comparable daily newspapers accounts for any distortion caused by greater than normal expenses. Accordingly, Cox's request that a pro-rata share of approximately $31.7 million in waste be added to the court's comparable sales-

20

based estimate of fair value would have the effect of adjusting twice for mismanagement and waste. Accordingly, we find no error in the court's refusal to include it.

E. Prejudgment Interest

Finally, Cox challenges the district court's refusal to award prejudgment interest. Section 607.1436(5) provides that the valuing court "may" award interest "at the rate and from the date determined by th[at] court to be equitable." Fla. Stat. § 607.1436(5). The statute further provides that "no interest shall be allowed" when the petitioning shareholder has acted arbitrarily or in bad faith by turning down a purchase price or otherwise lengthening the proceedings. Id. In other words, giving the statutory language its plain and ordinary meaning, the only limit on the court's discretion to award prejudgment interest on the value of shares to be purchased arises when the minority shareholder at issue has acted in bad faith. Otherwise, the court has complete discretion as to whether to award interest and as to the rate of any interest awarded.[10]

_____

[10]Cox's statement that § 607.1436(5) "allows the court to deny [prejudgment] interest only on a finding" of bad faith on the part of the shareholder constitutes a complete misreading of the discretion accorded by the statute. Appellee's Br. at 48 (emphasis added). Further, neither of the cases cited by Cox in support of an entitlement to prejudgment interest involves reversal of a failure to award it. See Morales v. Rosenberg, 919 So.2d 476, 479 (Fla. Dist. Ct. App. 2005) (affirming refusal to award prejudgment interest where petitioning shareholder acted in bad faith); In re Penepent Corp., 605 N.Y.S. 2d 691, 692, 198 A.D.2d 782, 783 (N.Y. App. Div. 1993) (affirming a discretionary award of interest without further explanation). Finally, because the court's award of postjudgment interest is not before us, we do not reach NJC's

21

Accordingly, we review for abuse of that discretion. Morley, 915 F.2d at 1523. We will find abuse of discretion only when a decision is in clear error, or when neither the district court's decision nor the record provide sufficient explanation to enable meaningful appellate review. See Amlong & Amlong,, 500 F.3d at 1238; BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1478 (11th Cir. 1992) (with regard to denial of a request for Rule 11 sanctions).

In this case, two rounds of briefing and a hearing preceded the district court's order as to the terms of purchase for Cox's shares of NJC. Throughout this process, NJC made clear that the magnitude of the court's valuation greatly limited the range of payment terms that would allow it to continue to operate. See R16-252 at 3, 7, 8-10; R17-260 at 2. NJC emphasized and neither party disputes that requiring it to pay a lump sum would force its sale to the third party or a fundamental alteration to its business model. See R16-252 at 3, 7, 8-10; R23 at 2-5, 8, 12, 18. In its order as to terms, the court reviewed the arguments made by NJC regarding the inadequacy of ready assets for a lump sum payment, its limited borrowing ability (which was necessarily based on its current EBITDA rather than the normalized margin), and its need instead to make installment payments in order

arguments regarding Fla. Stat. 55.03 and 28 U.S.C. § 1961. Even if the award of *post*judgment interest were mandatory, the award of *pre*judgment interest is still a matter of the court's discretion pursuant to § 607.1436.

to stay in business, and that made by Cox regarding its desire to be paid in full by lump sum with interest from the date suit was filed. Then, "as contemplated by the terms of the election-to-purchase statute" which allow for installment payments "in the interests of equity," the court found it "appropriate" to allow NJC to make installment payments. See R17-262 at 5. Immediately turning to the issue of interest, the court acknowledged the discretion accorded it by Florida law, explaining, through citation to an Indiana case interpreting a similar provision, that this meant it was "not required to act, but [could] do so within its discretion." R17-262 at 5 (quoting Wenzel v. Hopper & Galliher, P.C., 830 N.E.2d 996, 1003 (Ind. Ct. App. 2005). Finally, the court ordered the terms for purchase which included, inter alia, awarding post-judgment interest only, to be calculated according to "the rate described in 28 U.S.C. § 1961." See R17-262 at 6. The court exercised its discretion in declining also to award Cox prejudgment interest.

We find that the record provides sufficient support for this decision. One of the motivations behind enactment of the election statute was to enable Florida corporations to avoid dissolution in the face of minority shareholder dissent. Neither party disputes that NJC's financial circumstances significantly limited options for structuring the purchase that would still leave NJC with the freedom to pursue its particular business model. The judge's discussion of the "interests of

23

equity" in connection with his decision to order installment payments in this case, as it immediately preceded his discussion of interest, demonstrate his concern for balancing the interest of the minority shareholder in receiving fair value for its stock with the interest of the corporation in continuing as an operating business. Moreover, the court's summary denial of Cox's motion for amendment of the final judgment to add prejudgment interest, when that motion contained the same arguments made now before us, only further demonstrates that the district judge was fully aware of the correct breadth of his discretion and that he chose to exercise it thus. See R18-275.

Finally, although Cox argues that it "is entirely inequitable to deny Cox interest for the almost two-and-a-half-year period from the date of valuation to final judgment," we disagree. Appellant's Resp. Br. at 50. During the period in question, Cox continued actively to exercise its rights as a shareholder, including the receipt of $2.8 million in dividends, the receipt of annual audit reports, internal profit and loss reports, and participation in shareholder meetings. Because Cox enjoyed the benefits of its stock ownership throughout the prejudgment period, it cannot be said to be equitably entitled to realize interest for that period on the court-ordered value of that stock.

Because the award of prejudgment interest in a case such as this is entirely discretionary, and it is clear that the district court properly understood the extent of its discretion, and because Cox has no entitlement in equity to prejudgment interest, we find no abuse of discretion in the court's decision not to award prejudgment interest.

### III. CONCLUSION

NJC appeals the district court's valuation pursuant to Fla. Stat. § 607.1436 of Cox's 47.5% interest. We find the district court did not abuse its discretion in utilizing a comparable sales/fair market value method to determine "fair value" or, in the process thereof, in interpreting "going concern" to mean that the business would be run in a reasonably prudent manner going forward or in normalizing NJC's operating margin. We further find no abuse of discretion in the court's refusal further to adjust its calculation of fair value to account for any corporate waste. Accordingly, we **AFFIRM** the court's valuation of Cox's shares in NJC. Similarly, we find that the court did not abuse its discretion in refusing to award prejudgment interest, and we **AFFIRM** the district court as to that issue as well.