Matter of Ilich (2023 NY Slip Op 50171(U))

[*1]

Matter of Ilich

2023 NY Slip Op 50171(U)

Decided on March 8, 2023

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 8, 2023
Supreme Court, Bronx County

In the Matter of the Application of Richard Ilich, Petitioner, FOR THE JUDICIAL DISSOLUTION OF DRIVE ENTERPRISES CORP., ZULETTE REALTY CORP., AND UMITRON PRODUCTS, INC., PURSUANT TO § 1104(A)(1) & § 1104-A(A) OF THE BUSINESS CORPORATION LAW.

Index No. 260408/15

Counsel for Petitioner: Weisman Law Group, PC
Counsel for Respondent: Law Offices of Edmond J. Pryor 

Fidel E. Gomez, J.

In these special proceedings seeking dissolution of three corporations pursuant to, inter alia, BCL § 1104-a, respondent DANIEL ILICH (Ilich) seeks an order, inter alia, pursuant to BCL § 411 [FN1]
granting a judgment of dissolution pursuant to CPLR § 411, dissolving corporations DRIVE ENTERPRISES INC. (Drive) and ZUELETTE REALTY CORP. (Zulette). Ilich fails to assert any basis for dissolution [FN2]
and instead urges that any judgment issued should include a judicial determination (1) precluding petitioner from sharing in any of Drive and Zulette's proceeds; and (2) compelling petitioner to disgorge $2.5 million previously distributed to him from Drive's assets based on a stipulation between the parties. In support of the foregoing relief, [*2]Ilich avers that insofar as the stockholder agreements between the parties for Drive and Zulette condition petitioner's ownership of 50 percent of Drive and Zulette's shares upon his employment with the foregoing corporations, the uncontroverted fact that petitioner has never been so employed precludes any interest in the proceeds of Drive and Zulette. Petitioner opposes the instant motion averring that dissolution is not yet warranted because, inter alia, issues related to repayment of corporate debts by Drive still remain. With respect to the declarations sought by Ilich, petitioner opposes the same averring, inter alia, that the shareholder agreement does not condition petitioner's ownership of Drive and Zulette's shares on his employment at the corporations.
For the reasons that follow hereinafter, the motion is denied.
The instant three special proceedings were separately commenced [FN3]
, each seeking dissolution of three distinct corporations pursuant to BCL §§ 1104 and 1104-a. To the extent relevant here, the verified petition seeking dissolution of Drive, states, in relevant part, as follows. Drive is real estate management company, which owns and manages premises located at 905 Brush Avenue, Bronx, NY (905). Drive rents space at 905 to UNITRON PRODUCTS, INC. (Unitron) and six other tenants. Unitron pays Drive $12,500 per month in rent and the remaining tenants collectively pay Drive $25,000 per month in rent. Drive is authorized to issue 200 shares of common stock. On December 22, 1997, after petitioner guaranteed a loan secured by a mortgage pledging 905 as security, petitioner was issued 100 shares of Drive's stock by respondent, petitioner's father. As such, petitioner owns 50 percent of Drive's stock and respondent owns the remaining 50 percent. Petitioner alleges that for at least 10 years, respondent has instructed all tenants at 905, to pay rent directly to him instead of Drive. Rather than depositing the foregoing funds into Drive's bank account, which, inter alia, were used to pay Drive's mortgage, respondent has used the foregoing sums for his personal use. Petitioner has asked respondent to deposit the foregoing sums into Drive's account to no avail. In addition, respondent has failed to provide petitioner with dividends to which petitioner is entitled, and has failed to provide petitioner to portions of the rental income due to Drive and therefore, to petitioner as owner of 50 percent of Drive's stock. Even though petitioner has been managing Drive for 20 years, respondent removed petitioner's signatory authority from Drive's accounts, has refused to grant petitioner access to Drive's books and records, refuses to discuss the disposition of Drive's rental income, and, in fact, refuses to speak to petitioner at all. In addition, on September 2014, respondent threatened petitioner with criminal prosecution for embezzlement of Drive's funds and requested that petitioner relinquish all shares of Drive's stock. Attempts to resolve the issue by scheduling a shareholder's meeting have been fruitless inasmuch as respondent failed to attend such meeting, which petitioner scheduled on April 1, 2015. Based on the foregoing, petitioner seeks Drive's dissolution pursuant to BCL § 1104(a)(1) and (3), on grounds that the division between the directors is such that the votes required for action cannot be obtained and that the internal dissension between the directors is such that dissolution would be beneficial to the shareholders. Based on the foregoing, petitioner also seeks [*3]Drive's dissolution pursuant to BCL § 1104-a(1), on grounds that respondent is in control of Drive and is guilty of oppressive action toward petitioner.
The petition concerning Zulette states that Zulette is a real estate management company, which owns and manages premises located at 2811 Zulette Avenue, Bronx, NY (2811). Zulette initially rented 2811 to a company who manufactured rehabilitation equipment, but currently rents 2811 to the Center for Family Support, who pays $8,000 in monthly rent. Zulette is authorized to issue 200 shares of common stock. On December 28, 1999, after petitioner guaranteed a loan secured by a mortgage pledging 2811 as security, petitioner was issued 100 shares of Zulette's stock by respondent, petitioner's father. As such, petitioner owns 50 percent of Zulette's stock and respondent owns the remaining 50 percent. Even though petitioner has managed Zulette for 20 years, respondent removed petitioner's signatory authority from Zulette's accounts, has refused to grant petitioner access to Zulette's books and records, refuses to discuss the disposition of Zulette's rental income, and, in fact, refuses to speak to petitioner at all. In addition, on September 2014, respondent threatened petitioner with criminal prosecution for embezzlement of Zuelette's funds and requested that petitioner relinquish all shares of Zulette's stock. Attempts to resolve the issue by scheduling a shareholder's meeting have been fruitless inasmuch as respondent failed to attend such meeting, which petitioner scheduled on April 13, 2015. Based on the foregoing, petitioner seeks Zulette's dissolution pursuant to BCL § 1104(a)(1) and (3), on grounds that the division between the directors is such that the votes required for action cannot be obtained and that the internal dissension between the directors is such that dissolution would be beneficial to the shareholders. Based on the foregoing, petitioner also seeks Zulette's dissolution pursuant to BCL § 1104-a(1), on grounds that respondent is in control of Zulette and is guilty of oppressive action toward petitioner.
Respondent's motion seeking a judgment dissolving Drive and Zulette is denied. Significantly, respondent utterly fails to proffer any arguments in support of dissolution, fails to proffer any evidence relevant thereto and indeed, fails to establish how the evidence submitted supports such relief.
BCL § 1104, as relevant here, allows a court ordered dissolution of a corporation "when the holders of shares representing one-half of the votes of all outstanding shares of a corporation entitled to vote in an election of directors" (BCL § 1104[a]), present a petition and establish that "the directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained" (BCL § 1104[a][1]) or that "there is internal dissension and two or more factions of shareholders are so divided that dissolution would be beneficial to the shareholders" (BCL § 1104[a][3]). Significantly, ths salient issue with respect to dissolution under this section is whether a deadlock actually exists (In re Dream Weaver Realty, Inc., 70 AD3d 941, 942 [2d Dept 2010]; Matter of Kaufmann, 225 AD2d 775, 775 [2d Dept 1996]; Matter of Goodman v Lovett, 200 AD2d 670, 671 [2d Dept 1994]) and whether such deadlock poses "an irreconcilable barrier to the continued functioning and prosperity of the corporation" (Matter of Kaufmann. at 775; Matter of Goodman at 671). For purposes of dissolution, the underlying reason for the deadlock is irrelevant (In re Dream Weaver Realty, Inc. at 942; Matter of Kaufmann at 775; Matter of Goodman at 671).
Significantly, the mere failure to attend shareholder meetings or that one shareholder exercises sole control over the corporation's daily management does not amount to dissension between shareholders sufficient to warrant dissolution (In re Parveen, 259 AD2d 389, 391 [1st Dept 1999]; Nelkin v H. J. R. Realty Corp., 25 NY2d 543, 549 [1969]). Conversely, where [*4]"[t]he disagreements which developed [between directors] and the intensity of their discord becam[ome] so great that efficient management becam[omes] impossible," dissolution pursuant to BCL § 1104 is warranted (Application of Sheridan Const. Corp., 22 AD2d 390, 391 [4th Dept 1965], affd, 16 NY2d 680 [1965]).
BCL § 1104-a authorizes the judicial dissolution of a corporation on two grounds, when the directors representing "twenty percent or more of the votes of all outstanding shares of a corporation . . . present a petition of dissolution" (BCL § 1104-a[a]), and a court finds, inter alia, that
[t]he directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders . . . [or that] [t]he property or assets of the corporation are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation
(BCL § 1104-a[a][1], [2]). 
The purpose of the foregoing statute is to enable minority shareholders of closely held corporations to obtain relief, when they are either being denied participation in or excluded from corporate management, being refused employment by the corporation, or being refused payment of any dividends (Matter of Blake v Blake Agency, Inc., 107 AD2d 139, 144 [2d Dept 1985]). Accordingly, provided that the corporation's "stock is not traded on a securities market" (BCL § 1104—a[a]), BCL § 1104-a - often referred to as the involuntary dissolution statute - "permits dissolution when a corporation's controlling faction is found guilty of 'oppressive action' toward the complaining shareholders" (Matter of Kemp & Beatley, Inc., 64 NY2d 63, 68 [1984]). Whether conduct is oppressive sufficient to warrant dissolution is best understood against the backdrop of the purpose of the BCL § 1104-a, which by limiting relief only to those corporations not traded on the securities' market, is meant to apply to closely held corporations (Matter of Kemp & Beatley, Inc. at 71-72 ["As the stock of closely held corporations generally is not readily salable, a minority shareholder at odds with management policies may be without either a voice in protecting his or her interests or any reasonable means of withdrawing his or her investment. This predicament may fairly be considered the legislative concern underlying the provision at issue in this case; inclusion of the criteria that the corporation's stock not be traded on securities markets and that the complaining shareholder be subject to oppressive actions supports this conclusion."]). As the Court in Matter of Kemp & Beatly, Inc. noted,
[i]t is widely understood that, in addition to supplying capital to a contemplated or ongoing enterprise and expecting a fair and equal return, parties comprising the ownership of a close corporation may expect to be actively involved in its management and operation . . . Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and cares nothing for the responsibilities of management, the shareholder in a close corporation is a co-owner of the business and wants the privileges and powers that go with ownership. His participation in that particular corporation is often his principal or sole source of income. As a matter of fact, providing employment for himself may have been the principal reason why he participated in organizing the corporation. He may or may not anticipate an ultimate profit from the sale of his interest, but he normally draws very little from the corporation as dividends. In his capacity as an officer or employee of the corporation, he looks to his salary for the principal return on his capital investment, because earnings of a close [*5]corporation, as is well known, are distributed in major part in salaries, bonuses and retirement benefits
(id. at 71 [internal quotation marks omitted]). 
Accordingly, oppressive conduct falls within the ambit of BCL § 1104(a)(1) if it substantially defeats the reasonable expectations held by minority shareholders upon committing their capital to the particular enterprise (id. at 72; Hoffman v S.T.H.M. Realty Corp., 207 AD3d 722, 723 [2d Dept 2022]; Matter of Twin Bay v Kasian, 153 AD3d 998, 1002 [3d Dept 2017]). In determining whether expectations are reasonable, the court must determine what a respondent knew or should have known regarding petitioner's expectations in joining the corporation (id. at 73), and oppressive conduct only arises if the respondent's conduct objectively defeats those expectations (id. at 73). In Matter of Kemp & Beatley, Inc., the court held that petitioners had demonstrated that respondent's conduct was oppressive, when a longstanding practice of awarding dividends to shareholders solely based on the ownership of respondent's stock was changed shortly after petitioners left the company (id. at 74). While extra compensation to shareholders continued to be awarded, it was only done so based on the service that a shareholder provided to the respondent (id. at 74). Thus, the court held that this conduct, designed to exclude petitioners from a obtaining a return on their investment was oppressive as a matter of law (id. at 74-75 ["It was not unreasonable for the fact finder to have determined that this change in policy amounted to nothing less than an attempt to exclude petitioners from gaining any return on their investment through the mere recharacterization of distributions of corporate income."]). In Dissolution of Pickwick Realty Ltd. (246 AD2d 863 [3d Dept 1998]), the court held that dissolution on grounds of oppressive conduct was warranted upon proof "of the shareholders' attempt at voiding petitioner's shares, their falsification of corporate documents and their failure to allow petitioner access to records and documents" (id. at 866). Conversely, as noted by the court in Hoffman, when a shareholder is denied participation in the management of a corporation, solely based on a subjective expectation, dissolution is unwarranted (id. at 723). In Hoffman, petitioner sought dissolution because she was not allowed to participate in the corporation's management (id. at 723). In denying the petition, the court held that because for years petitioner never participated nor sought to be involved in the day-to-day management of the corporation, she had no reasonable expectation, when she became a shareholder that she would be allowed to be involved in such activities (id. at 723). Significantly, mere "dissatisfaction with the management of the corporation," is not sufficiently oppressive conduct warranting dissolution of a corporation (Matter of Brach, 135 AD2d 711, 712 [2d Dept 1987]). 
Significantly, before dissolution is ordered, it must be determined, pursuant to BCL § 1104-a, that "feasible means whereby the petitioners may reasonably expect to obtain a fair return on their investment" (BCL § 1104-a[b][1]) and "liquidation of the corporation is reasonably necessary for the protection of the rights and interests of any substantial number of shareholders or of the petitioners (BCL § 1104—a[b][2]; Matter of Kemp & Beatley, Inc. at 73). To that end, once oppressive conduct is found, it is the burden of the parties opposing dissolution to tender evidence demonstrating an adequate alternative to dissolution and in the absence of such evidence dissolution is warranted (Matter of Kemp & Beatley, Inc. at 73-75 ["After the referee had found that the controlling faction of the company was, in effect, attempting to "squeeze-out" petitioners by offering them no return on their investment and increasing other executive compensation, respondents, in opposing the report's confirmation, attempted only to [*6]controvert the factual basis of the report. They suggested no feasible, alternative remedy to the forced dissolution. In light of an apparent deterioration in relations between petitioners and the governing shareholders of Kemp & Beatley, it was not unreasonable for the court to have determined that a forced buy-out of petitioners' shares or liquidation of the corporation's assets was the only means by which petitioners could be guaranteed a fair return on their investments."]). 
Whether dissolution is warranted, is a determination solely within the court's sound discretion (Matter of Kemp & Beatley, Inc. at 73; Matter of Blake at 151).
In support of the instant motion, respondent submits an affidavit, wherein he states that to the extent that he agreed to a prior distribution of Drive's funds to petitioner, he did so in error. Respondent also states that upon a review of the stockholder agreements for both Drive and Zulette, petitioner's ownership of 50 percent of Drive and Zulette's stock was contingent upon petitioner's employment with the corporations. Respondent states that petitioner has never been employed by Drive or Zulette and as such is not entitled to 50 percent of their stock.
Respondent submits a so-ordered stipulation, dated July 19, 2017, wherein the parties agree that a portion of the sale proceeds from the sale of 905 would be distributed to petitioner and respondent "as partial distributions to the shareholders of Drive."
Respondent submits an order issued by the Court (Rodriguez, J.), dated March 21, 2016, wherein the Court appointed John M. Brickman as the receiver in this action to "wind down the operations of the corporations."
Respondent submits an affidavit [FN4]
, which he submitted in a related plenary action brought by petitioner against respondent, Drive, Zulette, and Unitron. Insofar as relevant to this motion, respondent states that in 1997, 1998 and 1999 he "gave [petitioner] stock in Drive, Unitron and Zulette. Such stock was given to petitioner at a time when respondent required petitioner to personally guarantee mortgages so that petitioner would have a personal stake in the foregoing corporations. Respondent also states petitioner diverted funds from Unitron and Zulette to another corporation, US Products, for his own benefits and that petitioner has denied respondent access to Zulette's records. Respondent states that petitioner claims that he lost Zulette's records and that only petitioner has access to the software used for bookkeeping and accounting. 
Respondent submits a deposition transcript [FN5]
memorializing testimony provided by petitioner in the action described above. To the extent relevant, petitioner testified that Zulette owned 2811, that Drive owned 905, and the Unitron was located at 905. Petitioner testified that he was involved in the management of Drive and Zulette since 1982, and that on October 29, [*7]1999 and May 12, 1998, petitioner executed shareholder agreements with respect to Drive and Zulette. Petitioner testified that neither Drive nor Zulette ever had any employees, and that petitioner was never an employee of either corporation. Petitioner was, however, employed by Unitron. With regard to Zulette, it housed a warehouse, which petitioner maintained. Drive's source of revenue was rental income from five tenants.
Respondent submits two stockholder agreements, which are nearly identical. The first is dated October 28, 1999, concerns Zulette, and is executed by petitioner and respondent. The agreement states, in pertinent part, that
WHEREAS, DANIEL ILICH was the sole stockholder of the corporation, named ZULETTE REALTY CORP., and the corporation in effect did issue two hundred (200) shares of no par value stock to him; and WHEREAS, in furtherance of company business RICHARD ILICH personally guaranteed to repay the mortgage amount due and owing to Ponce de Leon Federal Savings Bank and WHEREAS in consideration for the personal guarantee of RICHARD ILICH by virtue of a resolution approved at a Board of Directors Meeting of the corporation on the 28th day of October, 1999 RICHARD ILICH was given one hundred (100) shares of the stock of said corporation on the condition that he continues as an employee of the corporation and that he does not predecease DANIEL ILICH, the other owner of one hundred (100) shares of the remaining outstanding stock, NOW THEREFORE, it is mutually agreed as follows: 1. The corporation at its October 28, 1999 Board of Directors meeting canceled the two hundred (200) shares issued to DANIEL ILICH and authorized in place thereof the issuance of one hundred (100) shares to DANIEL ILICH and one hundred (100) shares to RICHARD ILICH.
With the exception that it concerns Drive and is dated May 12, 1998, the second stockholder agreement is identical to the first.
Based on the foregoing, respondent's motion seeking a judgment of dissolution pursuant to BCL §§ 1104 and 1104-a is denied. 
As noted above, BCL § 1104, as relevant here, allows a court ordered dissolution of a corporation "when the holders of shares representing one-half of the votes of all outstanding shares of a corporation entitled to vote in an election of directors" (BCL § 1104[a]), present a petition and establish that "the directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained" (BCL § 1104[a][1]) or that "there is internal dissension and two or more factions of shareholders are so divided that dissolution would be beneficial to the shareholders" (BCL § 1104[a][3]). The salient issue with respect to dissolution under this section is whether a deadlock actually exists (In re Dream Weaver Realty, Inc. at 942; Matter of Kaufmann at 775; Matter of Goodman at 671), and whether such deadlock poses "an irreconcilable barrier to the continued functioning and prosperity of the corporation" (Matter of Kaufmann at 775; Matter of Goodman at 671).
Here, respondent's papers are woefully deficient thereby warranting denial of this portion of the motion. Not only does respondent fail to proffer any arguments whatsoever in support of dissolution, he fails to even assert which section of the BCL warrants dissolution in this action and submits proof that viewed in the best light is utterly irrelevant for purposes of demonstrating entitlement to the relief sought. Significantly, insofar as relevant to BCL § 1104, respondent's evidence fails to establish the existence of the requisite deadlock required by law, let alone that such deadlock presents "an irreconcilable barrier to the continued functioning and prosperity of [*8]the corporation" (Matter of Kaufmann at 775; Matter of Goodman at 671).
The same is true for the portion of the motion concerning dissolution pursuant to BCL 1104-a. Again, provided that the corporation's "stock is not traded on a securities market" (BCL § 1104—a[a]), BCL § 1104-a - often referred to as the involuntary dissolution statute - "permits dissolution when a corporation's controlling faction is found guilty of 'oppressive action' toward the complaining shareholders" (Matter of Kemp & Beatley, Inc. at 68). Whether conduct is oppressive sufficient to warrant dissolution is best understood against the backdrop of the purpose of the BCL § 1104-a, which by limiting relief only to those corporations not traded on the securities' market, is meant to apply to closely held corporations (Matter of Kemp & Beatley, Inc. at 71-72). Accordingly, oppressive conduct falls within the ambit of BCL § 1104(a)(1) if it substantially defeats the reasonable expectations held by minority shareholders upon committing their capital to the particular enterprise (id. at 72; Hoffman at 723; Matter of Twin Bay at 1002). Here, the only evidence presented, which could be arguably viewed as relevant to respondent's burden is his scant affidavit, wherein he states that petitioner diverted funds from Unitron and Zulette to another corporation, US Products, for his own benefit and that petitioner has denied respondent access to Zulette's records. Unfortunately, this vague and conclusory assertion fails as a matter of law. The wholesale failure to specify nd discuss the breath of the foregoing conduct precludes this Court from concluding that the conduct was oppressive as a matter of law. More importantly, the dearth of facts leaves this Court unable to conclude that the conduct was pervasive enough to - as it must - defeat respondent's reasonable expectations upon embarking on the instant enterprise (Matter of Kemp & Beatley, Inc. at 71-72; (id. at 72; Hoffman at 723; Matter of Twin Bay at 1002). Accordingly, the instant motion is denied.
While on this record, this Court cannot enter a judgment dissolving Drive and Zulette, it will nevertheless - at respondent's urging, resolve the other issues before this Court, namely whether on this record, petitioner unconditionally owns 50 percent of Drive and Zulette's stock and if so, that he is entitled to share in the proceeds upon their dissolution and need not return sums already paid to him.
It has long been held that absent a violation of law or some transgression of public policy, people are free to enter into contracts, making whatever agreement they wish, no matter how unwise they may seem to others (Rowe v Great Atlantic & Pacific Tea Company, Inc., 46 NY2d 62, 67-68 [1978]). Consequently, when a contract dispute arises, it is the court's role to enforce the agreement rather than reform it (Grace v Nappa, 46 NY2d 560, 565 [1979]). In order to enforce the agreement, the court must construe it in accordance with the intent of the parties, the best evidence of which being the very contract itself and the terms contained therein (Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002]). It is well settled that "when the parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms" (Vermont Teddy Bear Co., Inc. v 583 Madison Realty Company, 1 NY3d 470, 475 [2004] [internal quotation marks omitted]). Moreover, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield at 569). Accordingly, courts should refrain from interpreting agreements in a manner which implies something not specifically included by the parties, and courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing (Vermont Teddy Bear Co., Inc. at 475). This approach serves to preserve "stability to commercial transactions by [*9]safeguarding against fraudulent claims, perjury, death of witnesses [and] infirmity of memory" (Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995] [internal quotation marks omitted]).
The proscription against judicial rewriting of contracts is particularly important in real property transactions, where commercial certainty is paramount, and where the agreement was negotiated at arm's length between sophisticated, counseled business people (Vermont Teddy Bear Co., Inc. at 475). Specifically, in real estate transactions, parties to the sale of real property, like signatories of any agreement, are free to tailor their contract to meet their particular needs and to include or exclude those provisions which they choose. Absent some indicia of fraud or other circumstances warranting equitable intervention, it is the duty of a court to enforce rather than reform the bargain struck (Grace v Nappa, 46 NY2d 560, 565 [1979]).
In the absence of fraud or other wrongful act, a party who signs a written contract is presumed to know and have assented to the contents therein (Pimpinello v Swift & Co., 253 NY 159, 162 [1930]; Metzger v Aetna Ins. Co., 227 NY 411, 416 [1920]; Renee Knitwear Corp. v ADT Sec. Sys., 277 AD2d 215, 216 [2d Dept 2000]; Barclays Bank of New York, N.A. v Sokol, 128 AD2d 492, 493 [2d Dept 1987]; Slater v Fid. & Cas. Co. of NY, 277 AD 79, 81 [1st Dept 1950]). In discussing this long-standing rule the court in Metzger stated that
[i]t has often been held that when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations. He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them and there can be no evidence for the jury as to his understanding of its terms. This rule is as applicable to insurance contracts as to contracts of any kind.
(Metzger at 416 [internal citations omitted]).
Provided a writing is clear and complete, evidence outside its four corners "as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (W.W.W. Assoc., Inc. v Giancontieri, 77 NY2d 157, 162 [1990]; see Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002]; Mercury Bay Boating Club Inc. v San Diego Yacht Club, 76 NY2d 256, 269-270 [1990]; Judnick Realty Corp. v 32 W. 32nd St. Corp., 61 NY2d 819, 822 [1984]). Whether a contract is ambiguous is a matter of law for the court to decide (id. at 162; Greenfield at 169; Van Wagner Adv. Corp. v S & M Enterprises, 67 NY2d 186, 191 [1986]). A contract is unambiguous if the language it uses has "definite and precise meaning, unattended by danger of misconception in purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion" (Greenfield at 569; see Breed v Ins. Co. of N. Am., 46 NY2d 351, 355 [1978]). Hence, if the contract is not reasonably susceptible to multiple meanings, it is unambiguous and the court is not free to alter it, even if such alteration reflects personal notions of fairness and equity (id. at 569-570). Notably, it is well settled that silence, or the omission of terms within a contract are not tantamount to ambiguity (id. at 573; Reiss v Financial Performance Corp., 97 NY2d 195, 199 [2001]). Instead, the question of whether an ambiguity exists must be determined from the face of an agreement without regard to extrinsic evidence (id. at 569-570), and an unambiguous contract or a provision contained therein should be given its plain and ordinary meaning (Rosalie Estates, Inc. v RCO International, Inc., 227 AD2d 335, 336 [1st Dept 1996]). 
Notably, while the parol evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument, it has no application in a suit brought where there are claims of fraud in the execution of an agreement or to rescind a contract on grounds of fraud (Sabo v Delman, 3 NY2d 155, 161 [1957]; Adams v Gillig, 199 NY 314, 319 [1910]; Berger-Vespa v Rondack Bldg. Inspectors Inc., 293 AD2d 838, 840 [3d Dept 2002]).
An agreement between stockholders is a contract like any other, and the parties thereto are bound by its terms (Weber v Sidney, 19 AD2d 494, 498 [1st Dept 1963], affd, 14 NY2d 929 [1964] ["Having charted and followed year after year a course patterned on the existence of this particular agreement, the stockholder parties here are to be held to its terms."]).
Here, respondent avers that pursuant to the language of the stockholder agreements, which is clear and unambiguous, petitioner's ownership of 50 percent of Drive and Zulette's stock was conditioned on his employment with the corporations, which at petitioner's deposition, petitioner answered in the negative. This, respondent urges, means that petitioner never owned the foregoing stock, which precludes petitioner from sharing in any proceeds upon dissolution and requires the disgorgement of funds already paid to petitioner upon the sale 905, Drive's asset. 
Again, the stockholder agreements state that
WHEREAS in consideration for the personal guarantee of RICHARD ILICH by virtue of a resolution approved at a Board of Directors Meeting of the corporation on the 28th day of October, 1999 RICHARD ILICH was given one hundred (100) shares of the stock of said corporation on the condition that he continues as an employee of the corporation and that he does not predecease DANIEL ILICH, the other owner of one hundred (100) shares of the remaining outstanding stock.
While the foregoing language is clear and seems to condition petitioner's ownership in Drive and Zulette's stock on his employment with the same, it is the only place where such condition, imposing the ownership upon petitioner's employment with the corporations, confers upon respondent the right of which he now seeks to avail himself. Indeed, everywhere else in the agreements where the grant of stock to petitioner is mentioned, there is no language conditioning ownership on employment. Accordingly, since it is well settled that "[a]lthough a statement in a "whereas" clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document" (Grand Manor Health Related Facility, Inc. v Hamilton Equities Inc., 65 AD3d 445, 447 [1st Dept 2009] [Court held that language in whereas clause could not create a lease where such right did no exist.]; see Dee Cee Assoc. LLC v 44 Beehan Corp., 148 AD3d 636, 641 [1st Dept 2017] [Court held that whereas clause extending lease termination date at odds with termination date in other parts of the lease could not extend the date of termination.]), here the agreement between the parties cannot be read to condition petitioner's ownership of Drive and Zulette's stock on his employment with the corporations. This alone warrants declaration that petitioner owns half of Drive and Zulette's stocks. Accordingly, the portion of the motion seeking declaration that petitioner does not own 50 percent of Drive and Zullete's stocks is denied, as is the application of disgorgement of funds already paid to petitioner. As such, the Court resolves that issue against respondent and in petitioner's favor.
Notwithstanding the foregoing, this Court is persuaded that even if the stockholder agreements conditioned petitioner's ownership of Drive and Zullete's stock on his employment [*10]thereat, which here, the record establishes that he was not, respondent - by his actions - would have nevertheless waived the right to claim 100 percent ownership of the foregoing stock under the agreements.
It is well settled that waiver is the voluntary and intentional relinquishment of a contract right, with both knowledge of its existence and an intention to relinquish it (Matter of Samuel v Samuel, 33 AD3d 1010, 1011 [2d Dept 2006]; DLJ Mortg. Capital Corp., Inc. v Fairmont Funding, Ltd., 81 AD3d 563, 564 [1st Dept 2011]). Significantly, waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection (Stassa v Stassa, 123 AD3d 804, 805 [2d Dept 2014] [internal quotation marks omitted]). Indeed, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned" (Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P., 7 NY3d 96, 104 [2006]), and abandonment may be established by affirmative conduct or by the failure to act so as to evince an intent not to claim a purported advantage (id. at 104; Stassa at 806).
Here, assuming, as urged by respondent, that the stockholder agreements conditioned ownership of Drive and Zulette's stock upon petitioner's employment therein, the record is replete with evidence that respondent waived such right. Saliently, respondent asserts that with regard to the prior distribution of a portion of Drive's funds from the sale of 905, he agreed to the same in error because petitioner "testified that he was not employed at Drive and Zulette at any time," and because upon a review of the stockholder agreements petitioner "has not satisfied the condition" of employment therein. This, however, as urged by petitioner, does not explain the complete failure by respondent, over a period exceeding two decades, to avail himself of the right, which he contends the agreements conferred upon him, namely the right to repudiate petitioner's ownership interest in Drive and Zulette's stock. Indeed, the record is clear that well before petitioner testified that he was never employed by Drive or Zulette, respondent knew or should have known that petitioner was not employed therein. To be sure, respondent was the only other shareholder in the foregoing corporations, who per the record, he created, managed, and grew into prosperous businesses. Yet, despite his close ties with the corporations, it was not until this motion that respondent claimed, for the first time, that by virtue of petitioner's failure to work at the corporations, he is not entitled to any of their stocks. This protracted period of acquiescence of petitioner's ownership rights in the foregoing stocks, by itself, establishes waiver.
More significantly, however, and while not addressed by the parties, here, the most compelling proof of waiver, and indeed, the elephant in the proverbial room and quite literally, the death knell for any arguments against waiver, is the stipulation between the parties dated July 19, 2017. Within the stipulation, despite his current averments regarding petitioner's ownership of Drive and Zulette's stock, respondent agreed to pay petitioner $2.5 million of Drive's assets, representing half of the proceeds from the sale of 905, which Drive owned. This consensual distribution is, of course, inconsistent with respondent's erroneous interpretation of the shareholder agreements, which, he urges, conditions petitioner's ownership of Drive stock upon petitioner's employment with the same. If respondent actually believed that respondent owned no stock, then he should have never agreed to pay petitioner half of Drive's assets. This conduct is fatal and is quintessential evidence of waiver.
Respondent's attempt to hide from his actions so as to avoid a finding of waiver is unavailing. To the extent that respondent, by asserting that he "acted upon misguided advice of [*11][his] former counsel," attempts to negate the element of the knowledge required for waiver, it does not avail him. The fact remains that because respondent signed the stockholder agreements, he is presumed to have read and understood its contents, the rights conferred therein, and as relevant here, his belief that petitioner did not own any shares (Pimpinello at 162; Metzger at 416; Renee Knitwear Corp. at 216; Barclays Bank of New York, N.A. at 493; Slater at 81). Moreover, since his attorney could not have, absent respondent's consent, executed the stipulation wherein respondent, ascribing to petitioner the status of owner of 50 percent of Drive's assets, respondent is necessarily charged with knowledge that what he agreed to was contrary to the rights he thought were conferred to him by the stockholder agreements. Indeed, even if the stipulation in question exceeded counsel's authority, petitioner is nevertheless bound thereby (Hallock v State, 64 NY2d 224, 228 [1984] ["A stipulation of settlement made by counsel in open court may bind his clients even where it exceeds his actual authority."]; see Chattin v Klock Oil Co., Inc., 270 AD2d 852, 852 [4th Dept 2000]; Kadosh v Kadosh, 169 AD3d 439, 439 [1st Dept 2019]), and therefore the waiver caused by the same. It is hereby
ORDERED AND DECLARED that upon dissolution, petitioner is entitled to share equally in the proceeds of Drive and Zulette and is entitled to keep proceeds already received from the sale of 905, paid to him pursuant to the stipulation dated July 19, 2017. It is further
ORDERED that petitioner serve a copy of this Order with Notice of Entry upon all parties within ten (10) days hereof.
This constitutes this Court's decision and Order.
Dated: March 8, 2023
Bronx, New York
______________________________________
FIDEL E. GOMEZ, JSC

Footnotes

Footnote 1:While respondent seeks judgment pursuant to CPLR § 411, which states that "[t]he court shall direct that a judgment be entered determining the rights of the parties to the special proceeding," it is presumed that he only directs that statute toward the portion of his application that seeks, in essence, a declaratory judgment with respect to petitioner's ownership of corporate stock. To the extent that respondent seeks a judgment dissolving the corporations, this Court treats the application as one pursuant to BCL § 1111(a)(3), which allows a court to "make a judgment or final order dissolving the corporation .. . . [i]n a special proceeding brought under section 1104 (Petition in case of deadlock among directors or shareholders) or section 1104-a (Petition for judicial dissolution under special circumstances)."

Footnote 2:To the extent that the record is bereft of any answer to the relevant petitions, this Court presumes that the basis for dissolution urged by Ilich is the same upon which the petitions are premised, namely BCL § 1104(a)(1), which allows dissolution when "the directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained," or BCL § 1104-a(1), which allows dissolution if "[t]he directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders."

Footnote 3:On September 8, the Court (Rodriguez, J.) issued an order consolidating the three proceedings under one caption bearing Index Number 260409/15. To the extent that the parties list the caption as bearing three separate actions, they do so in error.

Footnote 4:The affidavit, understandably so, focuses on alleged petitioner's actions with respect to Unitron and respondent's denial of allegations of wrongdoing asserted against him in the plenary action. Thus, it has virtually no probative value on the relief sought by respondent within the instant motion. Notably, it does significantly undercut the assertion made by respondent in his papers with respect to whether the stock given to petitioner was done so absent the requirement - as urged - that petitioner be employed by Drive and Zulette.

Footnote 5:Much like petitioner's affidavit, which respondent submits, the transcript does not have much probative value beyond, as urged by respondent, proof that petitioner never worked for Drive or Zulette.